No. 3053

JOHN LAWS *v.* THE STATE.

1. JUSTIFIABLE HOMICIDE.—Under the law of this State homicide is justifiable when inflicted for the purpose of preventing theft at night, and the homicide in such case may be committed at any time while the offender is at the place of the theft, or within the reach of gun shot of such place.

2. SAME—CHARGE OF THE COURT—TERM DEFINED.—"Night time" as that term must be construed within the purview of our statutes relating to burglary and theft, is any time between thirty minutes after sun set and thirty minutes before sun rise.   Evidence was adduced on this trial to support the theory of the defense that the homicide was committed in the prevention of theft at night, but the proof as to whether the homicide occurred before or after thirty minutes after sun set was conflicting.   *Held* that in this state of the proof the omission of the trial court to define *night time* in its charge to the jury, was material error.

3. SAME—MALICE.—A homicide, though committed while the deceased was committing a theft at night, would not be justified if the killing was in fact done upon malice, and not to prevent theft or the consequences of theft at night; and a charge of the court conforming to this doctrine is not error.

APPEAL from the County Court of Franklin.   Tried below before the Hon. W. P. McLean.

This conviction was in the second degree for the murder of Hiram Garrison, in Franklin county, Texas, on the twenty-first day of August, 1888.   A term of fifteen years in the penitentiary was the penalty imposed by the verdict and judgment.

C. A. Callaway was the first witness for the State.   He testified that he lived in Franklin county, Texas, about half a mile north of the town of Hagansport.   He was well acquainted with Hiram Garrison, in his life time, and last saw him alive about ten or fifteen minutes before sun down on the evening of his death.   He was then on the road which leads from witness's house to Keith's crossing of Sulphur creek, and about a quarter of a mile beyond the witness's house.   The defendant's distillery was about a mile distant from where witness last saw Garrison alive.   When the witness last saw him as stated, Garrison was in company with George Wright and Jennie Wade.

On the night of the same day the witness went to the still house of the defendant and saw the dead body of Garrison. The body lay in front of and about two feet distant from the front door of the distillery store house. A knee of deceased lay on each side of a log, and the head hung over the end of the log, touching the ground. Witness observed a large number of wounds on the body of Garrison which appeared to have been inflicted with squirrel shot. They entered at the back, to the right of the spinal column, and appeared to range toward the heart. The defendant and Lewis Singleton, Doctor Gibson and others were at defendant's distillery when the witness reached it on that night.

The defendant made a statement about the killing of Garrison, soon after witness reached the distillery. He said that he shot and killed Garrison; that he disliked very much to do it, but that "they" were stealing all of his whisky. He said that Garrison came to the distillery on that morning, and that he, defendant, became satisfied from Garrison's manner, etc., that "they" intended to make a raid upon his distillery that night; that, acting upon that conviction, he hastened through with his day's work, and sent his wagon home, going part of the way with it; that he and Singleton then tethered Singleton's horse in the brush, where it could not be seen from the distillery, and then went back to the distillery, and secreted themselves up stairs; that, after they had been there some time, they heard a disturbance among the chickens he kept about the distillery; that he then went to the south window of the building, looked out and saw Garrison coming towards the front door of the distillery store house; that he then went back to Singleton and reported that he saw Garrison coming to the front door, and that he told Singleton that, if Garrison went into his store house, he was going to do his best to shoot him; that he soon afterwards heard somebody enter the store house at the front; that he then went to the northwest corner of the building, reaching it just as Garrison was closing the door (coming out?); that he said to Garrison: "Garrison, this is the last time you will go into my warehouse!" and fired; that Garrison exclaimed: "O Lordy!" and sank down; that he, defendant, then called to Singleton to come and see what he had done, and why he had done it; that Singleton objected to coming, and he called to him that he *must* come; that he then told Singleton to get on his horse, go to Hagansport and report the killing and why it had been done, and

to notify the coroner, and not to spare his horse in going, for which he, defendant, would pay if injured or killed; that he, defendant, then proceeded to reload his gun, and about that time discovered George Wright with a shot gun standing in the hog pen, near the distillery; that Wright asked if Garrison was there; that he replied: "Yes, and not likely to leave;" that Wright then fled, pursued by him, defendant, for a short distance.

Describing the distillery and its approaches, the witness said: "Laws's still house—which fronts south—is about sixty feet long, north and south, and about thirty feet wide. The store room, which is on the ground floor beneath the still room, is in the northeast corner of the building. The ground slopes from the south to the north. The store room is a part of the whole building, but the door to it opens on the outside, and at the northeast corner on the north end. From the still to Hagansport is one mile, and from the still to Keith's crossing is about a mile. Hagansport is southeast from the still and Keith's crossing is northeast. My house is nearly east from the still, and there is a road leading by my house to the still. Garrison was not on that road when I saw him in the evening, but he was on the road to Keith's crossing. To go from where I saw him to the still, he would have to go on this road until he passed Mr. Martin's field and then turn west, through the bottom, to the still. There was no road through the bottom. The distance to the still from the point to where he would have to leave the road to get to the still, through the bottom, was about half a mile. In going from my house to the still, it was nearer to go the road than to go the route traveled by Garrison." Garrison was United States store keeper and gauger at Laws's distillery, at the time of his death. He quit boarding at the distillery in May, 1888, from which time until his death he boarded at the house of the witness. He was gone from witness's house about one-third of his time. Deceased had his shot gun with him when witness saw him on the said evening. He hunted a great deal and generally carried his gun.

Justice of the Peace J. P. Huskey testified, for the State, that early on the night of August 21, 1888, he was summoned to Laws's distillery to hold an inquest upon the dead body of Hiram Garrison. He found the dead body lying on the ground in front of the store or warehouse, about twenty inches from the door. Examination of the body discovered a large number

of wounds in the back, which appeared to have been inflicted by squirrel shot, fired from a shot gun. Witness searched the body, and in the pockets of the clothing he found the sum of seven and a half dollars in money, a pocket knife, a pair of spectacles, two pictures of Garrison himself, one of George Wright, one of Jennie Wade and one of a girl whom the witness did not know. He also found near the body a cloth game bag, about ten inches square in size, which contained two bottles of a liquid which looked and smelled like whisky. The door of the still house was closed but not locked, and the witness found the lock on the ground near the body. It was a spring lock. Witness locked the door with it, and afterwards found the key in Garrison's pocket book. He turned that key over to Mr. Patrick, the deputy United States revenue collector. A few pieces of gun wadding were found adhering to the coat of the deceased. The statement of the defendant with regard to the killing of Garrison was detailed by this witness substantially as it was related by the first witness.

H. T. Fullingame testified, for the State, that he lived in Franklin county, Texas, two and a half miles distant from the defendant's distillery. The witness was informed of the killing of Garrison by the defendant, between sun set and dark on the evening of August 21, 1888. Judge McLean, Mr. Low and witness were seated on his, witness's, gallery at the time mentioned (between sun set and dark), when Mr. Thad Pool, riding horseback, came to the house and reported the killing, and said that he was then on his way to summon the justice of the peace to take charge of the body and hold an inquest. It was not then dark, but was light enough for the witness to recognize the features of a man at a distance of twenty or thirty yards. The justice of the peace, Mr. Huskey, to whose house Mr. Pool was then going, lived about six miles distant from the witness. Immediately after eating his supper the witness went to the defendant's distillery, where he found the dead body and Doctors Gibson and Dickinson, Kin Martin, defendant's brother and others. The defendant had lived at the distillery until a short time before the killing, when he moved his residence to his place on the prairie. He had moved everything pertaining to his household except his chickens. Defendant was at the distillery when witness reached it. He was remarkably cool, calm and deliberate, and talked freely and dispassionately to the crowd. He said that he killed Hiram Garrison; that he killed him about

sun set on that evening, and that he killed him for stealing his whisky. He said that he anticipated a raid on his whisky that night by a crowd from across Sulphur, including Garrison; that Singleton came to his distillery late in the afternoon, and he told Singleton that he expected Garrison and a crowd to raid his warehouse that night, and that if they did, and Garrison went into the warehouse, he intended to kill him; that he requested Singleton to stay with him and help watch his warehouse, and Singleton consented; that he closed his work earlier than usual and started home with his wagon and hands, and then returned; that he and Singleton then hitched Singleton's horse in the brush, out of view of the distillery, and went back to the building; that they went into the loft to watch and await developments; that within a very short time he heard a disturbance among his chickens, and looked out through the gable end of the building to see what occasioned it; that he then discovered Garrison approaching the front door of the warehouse, and attempted to shoot him then but could not get him in favorable range; that he then returned to Singleton and informed him that Garrison was approaching the front door; that he then called Singleton's attention to the noise made by Garrison in opening the door, and a moment or two later to the rattling of bottles; that he then cautioned Singleton to make no noise, pulled off his shoes and slipped down to the corner of the warehouse; that when he reached the corner he saw Garrison's head protruding from the door, and that Garrison then had the lock in his hand and appeared to be putting a seal over the key hole; that he waited until Garrison arranged the lock, and then stepped outside and turned to lock the door, when he, defendant, said to him: "Garrison, you have gone into my warehouse the last time," and fired; that Garrison exclaimed: "Oh, Lordy!" sank down and expired; that he then called to Singleton to come and see what he had done, and a minute later told Singleton to get on his horse and ride as fast as his horse could travel to Hagansport, report what he, defendant, had done and why he did it, and to summon the justice of the peace. The defendant, after relating the circumstances of the killing, said that he would kill any man whom he should catch stealing the poorest pig or chicken he owned. He also said that the people of Hagansport who had theretofore thought he had not sufficient nerve to kill a man would discover their mistake. Defendant was not placed under arrest until some time after these statements.

Thad Pool was the next witness for the State.   He testified that he was a merchant and lived at Hagansport, about a mile and a quarter distant from the defendant's distillery.   While the witness with a friend was sitting on the gallery of his store, between sun set and dark, on the evening of August 21, 1888, Lewis Singleton rode up on a horse and reported that the defendant had recently killed Garrison at the distillery, and had sent him to Hagansport to report the fact, and to get somebody to go after the justice of the peace. . Witness remarked that he would go after the justice of the peace if he could get a horse. Doctor Dickinson, who was present, told witness he could get his horse and saddle by going to his house.   The witness went at once to Doctor Dickinson's house, bridled and saddled the horse, and went first to Fullingame's house, where he found Fullingame, Mr. Low and Judge McLean, to whom he reported the killing, and then went on to Justice of the Peace Huskey's house.   It was after sun down, but before dark, when witness reached Fullingame's house, which house was about a mile and a quarter distant from the witness's store.   From the house of the justice of the peace the witness went to the defendant's distillery, where he found Garrison's dead body, and, among others present, the defendant.   The defendant was so perfectly cool and calm, and talked so deliberately about the killing of Garrison that the witness thought at first that he must be drunk.   He said that he killed Garrison; that he became satisfied on that morning that a crowd from· beyond Sulphur, to include Garrison, would raid his distillery that night, and that he determined then to kill Garrison if he came to the distillery and entered his warehouse.   He said that he suspended work earlier than usual that evening, and sent his wagon home, accompanying it a part of the way; that he then prevailed upon Singleton, who came to his distillery that afternoon, to remain and watch with him that night; that, after secreting Singleton's horse in the brush, he and Singleton went up stairs over the still house to watch for the raiders; that soon afterwards he went to the gable end and saw the deceased approaching the front door of the warehouse; that he then returned to Singleton and told him that Garrison was coming to the warehouse door, and soon afterwards called Singleton's attention to the opening of the door, and then to the rattling of bottles; that he then told Singleton to listen well to what transpired, took off his shoes and slipped to the corner of the house opposite the ware room door; that from that point he

observed Garrison in the door, his head protruding, arranging a seal on the lock; that when Garrison stepped out of the door and turned his back to him, defendant, and began to lock the door, he, defendant, said to Garrison: "Garrison, you have gone into my warehouse your last time," and fired, and that Garrison, exclaiming, "O Lordy!" sank down and expired; that he then called to Singleton to come and see what he had done, and directed him to ride to Hagansport, without sparing horse flesh, report the killing and summon the justice of the peace to hold an inquest. The defendant then said that the people of Hagansport had thought that he did not have the nerve to kill a man, but that they would now know better. He also said that he would kill the best friend he had if he caught him stealing the poorest chicken or smallest pig that he owned; and, turning to witness, he said: "I would kill you if I caught you doing such a thing."

John Ray was the next witness for the State. He testified that he lived near Hagansport. He and A. Starks were employed in stacking hay for Henry Woodward, near Hagansport, on the fatal evening. Before sun down on that evening a man by the name of Wright and Jennie Wade, riding horseback, passed along the road about one hundred yards distant from the hay stack, traveling towards Sulphur. The witness was positive that it was not yet sun down when the said parties passed along the said road. Just at sun set the witness heard the report of a gun fired at or about the defendant's distillery. Witness was then on the hay stack, and he was positive that the said gun was fired at exactly sun set. Afterwards—half way between sun set and dark—Lewis Singleton, riding a horse, came from the direction of the distillery to a point near where the witness was, and hallooed to Mr. Woodward that the defendant had killed Garrison at the distillery. The witness went to the distillery after supper, and saw the dead body of Garrison, and heard the statement of the defendant, which he repeated, in substance, as did the witnesses Fullingame and Pool.

J. T. McCuiston testified, for the State, that he worked at defendant's distillery from April 10 to May 17, 1888. Garrison was the government store keeper and guager. One day when Deputy Collector Patrick was expected to visit the distillery Garrison asked witness to signal for him on the whistle if Patrick came. Soon afterwards defendant asked witness to give him

the signal that would call Garrison, as he wanted to have some sport. Defendant then blew the whistle so nearly to imitate the signal that Garrison came to the distillery. Witness met Garrison at the door and told him that defendant had signaled for him in sport. Garrison became angered, and defendant laughed at him.

The defendant's still house was built fronting south. The store room was in the northeast corner of the house, and the cistern room was in the northwest corner, both being below the still room floor. The whisky was run out of the worm of the still into the cistern, and was then drawn from the cistern into barrels, which were then guaged and tested, and placed under the guager's stamp, and then rolled into the store room, where they remained until the revenue tax on the same was paid, when they were delivered to the owner by the store keeper. The said store room was kept locked with a United States government lock, to which Garrison carried the key. After the whisky was placed in the store house, it could not be legally removed therefrom until the tax was paid, and then only in the original packages. When Garrison became angry with defendant for signaling him to the distillery, he told the defendant that he would not give him any more whisky to drink. Garrison appeared to be always supplied with whisky for drinking purposes, and on one occasion at least, gave the witness some. After Garrison told defendant that he would not give him any more whisky and left, defendant said to witness: "If I catch Garrison with any more of my whisky I will kill him." The still was "shut down" on May 17, 1888. Just after the last "run" was made, defendant brought a ten gallon keg to the still, which he asked Garrison to fill for his, defendant's, private use. Garrison refused to do so, but said that he was going to store all the whisky "run down." Defendant became very angry with Garrison for refusing to fill the keg. On the morning of May 20, 1888, when witness was getting ready to leave, defendant asked the witness if he was coming back in the winter. Witness replied that he did not know. Defendant said: "Come back! We will have a new store keeper." Witness asked him if he had reported Garrison. He replied that he had not, but would have a new store keeper, and that he would kill Garrison before he should stay there.

George L. Patrick testified, for the State, that he was deputy revenue collector for the fourth district of Texas. He put

Howard Hargrave in possession of the store room at Laws's distillery as storekeeper, on September 1, 1888, as successor to Hiram Garrison. He and Hargrave did not guage the whisky in the said store house. They found the said store house to contain fourteen packages of whisky, which they measured with short sticks. Witness estimated that the packages contained all the whisky they should contain, except a fair allowance for shrinkage. The government allowed for shrinkage six gallons to forty-four in three years. Witness admitted that he did not know what whisky was in the store house until he counted the packages, and could not know what quantity of whisky should have been there without consulting the books, which were in the possession of Mr. Henderson at Sulphur Springs. Witness reported what he found in the store house to Mr. Henderson. The defendant never complained to witness about Mr. Garrison.

R. M. Henderson, deputy United State revenue collector, testified for the State that on or about September 1, 1888, he sent Mr. Patrick to Laws's distillery to put Howard Hargrave in possession of the same as storekeeper. Patrick reported to witness what quantity of whisky he found in the said store, which was all there should be there, allowing a fair estimate for shrinkage. While guager and storekeeper at Laws's distillery, Garrison had the legal right to go into the said still at any time to look after the interests of the government.

B. Leake testified, for the State, that he was at Laws's distillery on the twenty-first day of August, 1888, and asked the defendant why Garrison was not there. He replied that he, defendant, was making nothing but peach brandy; that the government accepted his, defendant's, report of the quantity of peach brandy he "run out," and that Garrison's continuous presence at the still, while peach brandy was being made, was not required. He then said that since he quit distilling whisky, in May, his store house had been entered eighteen or twenty times, and only seven of those times while he was present; that "they" were stealing him out, and that if "they" did not look out he would catch up with some of them. He said also that he was expecting a raid on his store that night.

The State closed.

A. Z. Stark was the first witness for the defense. He testified that he was in Henry Woodward's field, at work with the State's witness Ray, and Woodward and Hemby, on the evening of the fatal day. He quit work about "half way" between

sun set and dark on that evening, up to which time Singleton had not come to nor passed that place, nor reported the killing of Garrison, as stated by Ray. Witness did not hear of the killing until next day. He saw Wright and Jennie Wade on that evening traveling the road to Keith's crossing. They were then within four hundred yards of C. A. Callaway's house, and the time was just about sun set.

J. A. Elliott testified, for the defense, that he lived at Hagansport, about a mile and a quarter distant from the defendant's distillery. He was at home on the afternoon and evening of the fatal day. While sitting on his north gallery he heard the report of a gun fired at or near defendant's distillery. It was then good dusk. Witness lived on the prairie. "It gets dark in the bottom somewhat sooner than on the prairie."

John Brimer testified, that on the day of the killing he was at work about a mile and a quarter distant from defendant's distillery. He heard the report of a gun fired at or about the said distillery. It was then deep dusk on the prairie, where the witness was. Defendant's distillery was situated in the Sulphur bottom, where it got dark sooner than on the prairie. Darkness falls one hour after sun set, and it is deep dusk about a quarter of an hour before dark. The shot heard by the witness was fired about forty-five minutes after sun set. Kin Martin testified that he was at work with John Brimer, and heard the report of the gun mentioned by Brimer. It was good dusk when that shot was fired.

C. W. King testified, for the defense, that he heard the report of a gun fired at or near the defendant's distillery. It was then fifteen or twenty minutes after sun set. Singleton afterwards, at dark, came to Hagansport, where the witness was, and reported the killing of Garrison by defendant.

W. L. Gibson testified, for the defense, that he went to defendant's still late on the fatal evening with a wagon load of peaches. When he got to a point within two hundred yards of the still he saw, at a point about twenty steps to his right, a woman on a horse, and leading a horse on which there was a man's saddle. Witness did not recognize that woman at first, because it was too dark. A short distance further in the direction of the distillery, he met the defendant with a shot gun. Defendant said he had killed one man, and would have killed another had that other not reached his horse in time. Defendant then told witness that he had killed Garrison at his store

door; that he then discovered Wright standing in his hog pen, and he loaded his gun as rapidly as possible, but that Wright fled and he had pursued him. The witness did not hear the report of a gun while near the distillery, but his wagon made a great deal of noise on the road.

Jennie Wade testified, for the defense, that she lived in Red River county, Texas, about a mile distant from Keith's crossing of Sulphur Creek.

The witness and George Wright went from the witness's house to Hagansport on August 21, 1888, Wright taking witness's pony to be ridden back to witness's house by Garrison. Leaving the pony at Callaway's house, where Garrison boarded, witness and Wright went on to Hagansport. They left Hagansport in the evening, and when they reached Callaway's house they were joined by Garrison. The three then took the road to Keith's crossing, and traveled it until they reached a point beyond Mr. Martin's field, where they left it and crossed the bottom towards, and near to, Laws's distillery. They stopped on the slough near but out of view of the distillery, at which point Garrison left the witness and Wright, going towards, and, as he said, to the distillery, where he claimed to have a matter of business. A few minutes later the witness heard the report of a gun, fired at or about the still. "It was then good dusky dark." Wright then went towards the still, but soon returned, saying "something is to pay up there," and he and witness rode off. When they got to Sulphur, half a mile distant, it was so dark that witness could not guide her pony across.

William Hooks testified, for the defense, that he worked at defendant's still on the fatal day. He quit work about fifteen minutes after sun down, and then left the still, going to his house, a mile and a half distant. He did not hear the report of a gun on that evening.

The defense closed.

C. C. Dupree testified, for the State, in rebuttal, that the place where John Brimer claimed that he stacked hay on the evening of the tragedy was at least two miles distant from the defendant's still.

R. Watts testified, for the State, in rebuttal, that he heard the gun fire at the defendant's still, and that it was fired a very few minutes after sun set.

J. D. Benton testified, for the State, in rebuttal, that he was at work on his house, a short distance from where Ray and

Woodward were at work, on the fatal evening. He heard a shot fired at or near the defendant's still, and, a short while afterwards, heard Singleton halloo to Woodward that defendant had killed Garrison. Witness then went to where Woodward and Ray were, reaching that point at "about half way between sun set and dark."

*Talbot & Turner, R. E. Kennon* and *Hiram Glass*, for the appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

WILLSON, JUDGE. Homicide is permitted by law when inflicted for the purpose of preventing theft at night, and the homicide in such case is justifiable at any time while the offender is at the place where the theft is committed, or within reach of gun shot from such place. (Penal Code, art. 570.)

In this case no question is made as to the commission of the homicide by the defendant, but defendant claims that, at the time he shot and killed the deceased, the latter had committed theft of whisky belonging to the former, and was within gunshot of the place where the theft was committed, and that it was night time when the theft and homicide were committed, and that he committed the homicide for the purpose of preventing the consequences of the theft. There is evidence tending to support this defense.

In instructing the jury with reference to such defense the court omitted to define night time. This omission in the charge was not excepted to, but was insisted upon as error in defendant's motion for a new trial. There is a conflict in the evidence as to the exact time when the homicide occurred. Some of the witnesses fix the time at later than thirty minutes after sun set, and some at about sun set. This being the state of the evidence, it was very important to the defendant, we think, that the jury should understand the legal meaning of the word "night," as used in the statute referred to. This statute does not furnish a definition of the word, and we must therefore resort to other authorities for its meaning. At common law day time means those portions of the morning and evening wherein, though the sun is below the horizon, sufficient of his light is above for the features of a man to be reasonably discerned. If there is not sufficient light for this purpose, it is night. Light from the moon is not to be taken into account. There is no middle space between day and night; but, where

one begins, the other ends.    But the difficulties of applying this common law rule are so considerable that it has been changed by statute in England, and in most of the American States, and these statutes prescribe exactly the time which separates the day from the night.    (Bish. Stat. Crimes, sec. 276.)

In this State, with reference to the crime of burglary, it is provided: "By the term 'day time' is meant any time of the twenty-four hours from thirty minutes before sun rise until thirty minutes after sun set." (Penal Code, art. 710.)    Again, it is provided that "words which have their meaning specially defined shall be understood in that sense, though it be contrary to their usual meaning." (Penal Code, art. 10.)    It is clear to our minds, in view of the provisions cited, that a "theft by night" is a theft committed at any time between thirty minutes after sun set and thirty minutes before sun rise, and the court should have so instructed the jury; and, having failed to do so, committed a material error calculated to injure the defendant's rights.

Relating to the defense before mentioned, the court among other instructions gave to the jury the following in substance: "If you find that the defendant killed the deceased in the execution of a previously formed intent or plan to take his life, and not to prevent theft then being committed, or to prevent the consequences of the same, such killing would not be justified though done in the night time and whilst deceased was committing or had committed a theft."    This instruction was not excepted to, but was urged by defendant as error in his motion for a new trial, and is insisted upon here as error.    We are of the opinion that the instruction is not erroneous.    If the killing was upon malice, and not to prevent a theft or the consequences of a theft, it would not be justified under the statute, although a theft by night was actually being committed by the deceased at the time he was killed.    It is not the intention of the statute to justify *murder*.    Such a construction of the statute would to our minds be unreasonable and exceedingly dangerous.

Other questions presented on this appeal are not discussed and determined, because they are not likely to arise on another trial.    Because the charge of the court is materially defective in not instructing the jury in the legal meaning of day time and night time, the judgment is reversed and the cause is remanded.                    *Reversed and remanded.*

Opinion delivered December 19, 1888.