Walter Lee MORRIS, Appellant,

v.

The STATE of Texas, Appellee.

No. 45485.

Court of Criminal Appeals of Texas.

Jan. 10, 1973.

Murray H. Nance, Jr., Stephen F. Hefner, Sherman, for appellant.

Clifford Powell, County Atty., and Robert E. Richardson, Jr., Asst. County Atty., Sherman, and Jim D. Vollers, State's Atty., Robert A. Huttash, Asst. State's Atty., Austin, for the State.

## OPINION

DOUGLAS, Judge.

This is an appeal from a conviction for murder. The punishment was assessed at death.

The indictment alleged that on December 23, 1969, Walter Lee Morris killed D. C. Arnold by shooting him with a gun. The record reflects that Arnold was a sergeant of the Sherman police department.

The sufficiency of the evidence is not challenged. The main issues on appeal concern the denial of a motion to change venue and the admission of a written confession into evidence.

Most of the incriminating testimony was from the fifteen-year-old accomplice witness Jerry Fisher. Fisher testified that Walter Lee Morris, his brother L. V. Morris, Gregory Jackson and he drove from Dallas to Sherman in Gregory's 1960 model Chevrolet automobile two days before Christmas. While they were in Sherman, they drove by the Rocket Oil Service Station and L. V. Morris stated that he saw only one man there. L. V. then turned toward the back seat where Walter and Jerry were seated and asked, "Did we want to take this one?" L. V. drove on past an underpass and stopped. Walter, who was carrying a .38 caliber revolver under his belt, put a black handkerchief over his face and asked Jerry if he was going with him. Jerry agreed and the two went to the service station where Walter looked around a corner and said that the man was sitting down. Walter then took the revolver in his hand, ran into the station and grabbed the man by the arm and jerked him out of the chair. He then took the man's billfold and a .22 caliber revolver which he gave to Jerry. Walter then took the bills from the cash register and Jerry picked up some change. They tied the hands and feet of the attendant and Jerry was attempting to open the safe when an officer drove up. They pushed the attendant into the restroom and then they entered and closed the door.

The policeman got out of his car and said, "Rock, Rock—What's the matter, Rock?" (The attendant was known as Rock Chambers.) By then he was in the station and Walter stuck the .38 revolver out the door and fired some six times, emptying his gun at the officer. Jerry fired some two or three shots at the attendant who was on the floor and then some two or three shots as he left at the policeman on the floor. The two then ran toward their car until they saw some police officers there.

They then went to a house and when a man came to the door, Walter jerked the locked screen door open, held the "38" at his head and ordered the man to bring his wife and baby and drive the two to Dallas. The man did as he was told.

The confession of Walter Lee Morris, the appellant, was introduced. It recited that the four men went to Sherman and he and Jerry Fisher left the car to rob the attendant of the service station. It differed from the testimony of Fisher in some minor details, but not substantially. It recited that the appellant emptied his gun at the officer and ran. When they got near their getaway car, they saw the officers and went to the house and ordered the man to take them to Dallas. Sometime later, he

gave some of the money taken in the robbery to Fisher. The confession also shows that he sold the gun to a man called Rob.

The testimony of the accomplice witness Fisher and the confession were corroborated by the testimony of the officers and other witnesses from Sherman. One witness testified that at about 4:30 a.m., he saw two colored men standing at either side of "Rock" Chambers at the cash register in the station and no car was parked there. Officer Choate testified that he drove by the station at approximately 4:40 a.m. and noticed the patrol car of Officer Arnold parked at the station. He did not see Arnold, but did not consider this unusual because Arnold usually stopped there about that time every morning. A short distance away he saw two colored men in a parked car and one of them stated they had car trouble. Officer Medlin arrived and the two were directed to another all night service station.

At approximately 5:20 a.m., Officer Choate drove to the Rocket Oil Service Station and found the patrol car still parked in the driveway. He went inside to check and found Officer Arnold's body on the floor. His gun was still in the holster. The body of Chambers was in the restroom.

Officer McConnell testified that at approximately 5:35 a.m., after hearing about Officer Arnold's death, he saw two colored men in a slowly moving 1960 model Chevrolet. He stopped the car and they identified themselves as Lavera Morris and Gregory Jackson.

During the autopsy, several projectiles, both large and small, were found in Arnold's body.

Joseph Robertson, although not too definite in his testimony, identified the appellant from others in the courtroom as being the one who ordered him to take his wife and infant son along and forced him to take the two men to Dallas.

The appellant did not offer any testimony before the jury. He testified only before the court on the voluntariness of the confession.

## Motion for Change of Venue

■ First, the appellant contends that the court erred in overruling his motion for change of venue. He filed affidavits of two compurgators which recited that because of publicity he could not receive a fair trial in Grayson County. The State filed affidavits reciting that neither of the compurgators had sufficient knowledge of the people in the county or information to justify their statements that prejudice existed against Walter Lee Morris.

At the hearing on the motion to change venue, two witnesses were called by the defense. One testified that because of the publicity about the case it would be difficult to obtain a fair trial. The other witness testified that he thought that a fair trial could not be obtained in Grayson County.

Three witnesses called by the State testified that in their opinion Morris could receive a fair trial in Grayson County.

Seventy-six prospective jurors were examined. Twenty-one were excused because they could not assess the death penalty under any circumstances. Six were excused because they could not consider a minimum penalty of two years for one convicted of murder. Five were excused for medical reasons.

Five friends of the deceased and six who had formed opinions as to the guilt or innocence were excused. Others were excused for different reasons not connected with publicity and not because of opinions formed.

No person who served on the jury had formed an opinion as to guilt or innocence, though most had heard of the case or read about it in the newspapers. This case was

tried in September of 1970, some ten months after the date of the offense.

According to the 1970 census, Grayson County had a population of 80,890.

The appellant exercised only fourteen of his fifteen peremptory challenges authorized at the time.

In Taylor v. State, Tex.Cr.App., 420 S.W.2d 601, thirty-nine of the 112 prospective jurors questioned expressed an opinion that the defendant was guilty. In that case, as well as in the present case, the newspaper accounts appear to be fair and non-inflammatory and apparently published to inform the public of current events. Only fourteen peremptory challenges were used and therefore there is no showing that the defendant was forced to take an objectionable juror.

In Beck v. Washington, 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98, the Court said:

"The fact that petitioner did not challenge for cause any of the jurors so selected is strong evidence that he was convinced the jurors were not biased and had not formed any opinions as to his guilt. * * *

"While this Court stands ready to correct violations of constitutional rights, it also holds that 'it is not asking too much that the burden of showing essential unfairness be sustained by him who claims such injustice and seeks to have the result set aside, and that it be sustained not as a matter of speculation but as a demonstrable reality.' United States ex rel. Darcy v. Handy, 351 U.S. 454, 462, 76 S.Ct. 965, 970, 100 L.Ed. 1331, 1338 (1956).

" * * * of course there could be no constitutional infirmity in these rulings if petitioner actually received a trial by an impartial jury."

In Pamplin v. Mason, 364 F.2d 1, the Fifth Circuit Court of Appeals wrote:

". . . The test is no longer whether prejudice found its way into the jury box at the trial. . . ."

and

"As we read the Supreme Court cases, the test is: Where outside influences affecting the community's climate of opinion as to a defendant are inherently suspect, the resulting probability of unfairness requires suitable procedural safeguards, such as a change of venue, to assure a fair and impartial trial. As the Supreme Court stated in Sheppard v. Maxwell [384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600]:

" 'Due process requires that the accused receive a trial by an impartial jury free from outside influences. Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused. * * * [W]here there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity. * * * If publicity during the proceeding threatens the fairness of the trial, a new trial should be ordered.' 384 U.S. at 362, 86 S.Ct. at 1522, 16 L.Ed.2d at 620."

In Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751, Justice Clark, speaking for the Court, wrote that it is not required that jurors be totally ignorant of the facts and issues involved in this day of widespread and diverse methods of communication. He also noted that an important criminal case can be expected to arouse interest of the public in the vicinity and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.

He further wrote that it is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

In the present case there is no showing that publicity created a prejudice so great as to prevent a fair trial. It appears that the appellant was tried by jurors who had no opinion as to his guilt and that he received a fair trial.

Our courts cannot and do not operate in a vacuum. Courts deal with people and crimes which are newsworthy. To require a trial of jurors who had never heard of a highly publicized crime would be impractical if not impossible. Certainly, it was never intended that jurors were to be selected from those who did not read newspapers or keep up with current events through other media. Jurors selected from such a group, if there are enough to be called a group, would not be representative. To hold otherwise would be to hold that the perpetrator of a very highly publicized crime such as the assassination of a president, a governor or any widely known person could never be tried.

We hold no error has been shown.

### Admissibility of the Confession

Next, the appellant complains that the court erred in admitting his written statement or confession into evidence. A Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908, type hearing was held outside the presence of the jury.

Shelby Bowling, a deputy sheriff of Grayson County, testified the appellant was taken before Judge Tom Naylor, a magistrate in Dallas County, May 19, 1970, the day he was arrested and warned of his rights in accordance with the provisions of Article 15.17, Vernon's Ann.C.C.P. No statement was made at that time. He was also taken before Judge McGuire, a magistrate in Grayson County, on May 19, 1970. The appellant testified that he signed the card after the warning had been read to

him by Judge McGuire and made a statement May 26, 1970, in Dallas when his wife and John Tillia, a reporter of the Dallas Morning News, were present. He made a second statement May 28, 1970, in Sherman because the appellant stated he had left something out of the first statement. One small paragraph was added when the second statement was made, otherwise, it was identical to the first.

Bowling testified in substance, without setting out all of his testimony, that all of appellant's rights were explained to him as required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, and Article 38.22, V.A.C.C.P., and that there was no coercion or inducement and that the statement was voluntarily made. He also testified that there were no promises or inducements or coercion when the appellant was warned prior to his making the second statement.

The appellant testified that before he made the statements he was choked, beaten and threatened with a shotgun and otherwise mistreated. He further testified that he was not allowed to see his wife and was not allowed to see an attorney after he asked for one.

After all of his testimony about his mistreatment, he testified that he was hard to scare and that the only reason he signed the statements was because he was told that he could make bond and he wanted to see his wife. The appellant testified that when he signed the statement those present were his wife, a newspaper reporter, Detective Bowling and himself. He testified that it was a week after he had been threatened before he signed the statement and it was not because of fear.

After the hearing, the court found that the appellant was properly warned and that the statement was voluntary.

No testimony was offered on the voluntariness of the statement before the jury. We are, therefore, limited to the admissibility of the confession as a matter of law.

In Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963), petitioner contended that his confession was involuntary, and thus constitutionally inadmissible, because it was induced by police threats and promises. He testified at trial that during the approximately 16-hour period between the time of his arrest and the making and signing of the written confession, he several times asked police to allow him to call an attorney and to call his wife. He said that such requests were uniformly refused and that he was repeatedly told that he would not be allowed to call unless and until he "cooperated" with police and gave them a written and signed confession admitting participation in the robbery. He was not permitted to phone his wife, or for that matter anyone, either on the night of his arrest or the next day. The police persisted in their refusals to allow him contact with the outside world, he said, even after he signed one written confession and after a preliminary hearing before a magistrate, late on the day following his arrest. According to the petitioner, he was, in fact, held incommunicado by the police until some five or seven days after his arrest.

The United States Supreme Court held that Haynes' written confession was involuntary and inadmissible because he was held incommunicado and he was told by police officers that he could not communicate by telephone with his wife until after he made a written confession. The Court stated that the record did not reflect any controverting evidence to contradict Haynes' account of his interrogation. It was also uncontroverted that Haynes was not taken before a magistrate and granted a preliminary hearing until he had acceded to demands that he give and sign the written statement. Nor was there any indication that Haynes was given proper warning prior to signing the written confession, or even thereafter.

In the present case the allegations were controverted by direct evidence.

 We hold that the trial judge had sufficient evidence to conclude as he did that the statement introduced into evidence was voluntarily made without compulsion or persuasion and that no promises were made to obtain the statement.

Before this case was argued in this Court, the Honorable Preston Smith, Governor of Texas, commuted the punishment from death to life. For this reason, the judgment of the trial court should be, and is ordered reformed to show the punishment to be assessed at life. See Whan v. State, Tex.Cr.App., 485 S.W.2d 275.

No reversible error has been shown. The judgment, as reformed, is affirmed.

ONION, P. J., not participating.