**Kenneth ADAMI, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 49582.**

Court of Criminal Appeals of Texas.

June 25, 1975.

Rehearing Denied July 16, 1975.

Mann, Cronfel & Person, Nat B. King, Oscar J. Pena, Laredo, for appellant.

Charles R. Borchers, Dist. Atty., Donato D. Ramos and Stephen A. Whitworth, Asst. Dist. Attys., Laredo, Jim D. Vollers, State's Atty., and David S. McAngus, Asst. State's Atty., Austin, for the State.

## OPINION

GREEN, Commissioner.

This appeal is from a conviction of murder with malice. Punishment was assessed at life.

The indictment charges that on or about November 22, 1972, in Webb County, Texas, appellant, with malice aforethought, killed Jose Alfredo Avalos by shooting him with a rifle.

Considering the evidence most favorable to the verdict and judgment, the record reflects the following:

On November 23, 1972, officers Young and Escobedo of the U.S. Border Patrol were contacted in Freer by appellant and his companion, Edgar Williams. Appellant told the officers that on the preceding day he had a break-in at his ranch house in Webb County and had shot five men "that appeared to be Mexican aliens" with his .257 Weatherbee Magnum hunting rifle. He delivered the rifle to the officers, and volunteered to go with them to the site of the shooting. While en route he was overheard telling Williams: "That's kind of cold blooded, but I did it and I am ready to go."

Investigation by Young and Escobedo and other officers proved that on November 22nd five men, citizens of Mexico, who had illegally crossed the Rio Grande River into Texas several days earlier, were shot and killed while in a small house on the Adami ranch in Webb County. Jose Alfredo Avalos, the deceased named in the indictment, was one of these men, and the evidence indicated that he was the first one who was shot.

The State's evidence reflects that these men, seeking shelter from the cold, rainy weather, entered the house some time prior to the shooting, and that at the time they were shot they were in the kitchen eating tortillas and drinking cans of V8 juice which they had brought with them in packsacks. At least four of the shots were fired through a window from outside of the house, and four spent .257 magnum shells were found on the ground by the window. Two other shots were fired while the killer was inside the kitchen. Avalos was shot in the back of his head, and the top of his head was blown off. The other four were shot in varying portions of their bodies, all of which were in the posterior or back side of the mid-axillary line of the body.[1] No firearms or other weapons were found in the house by investigating officers.

The house in which the bodies were found was pictured by State's witnesses as appearing to be an abandoned uninhabited shack, with a large amount of accumulated dirt and animal droppings on the floor and furniture, and with grass and weeds a foot and a half high growing around it, and boards nailed across the windows. A number of photographs of the exterior and interior support the testimony of State's witnesses.

Appellant testified that the house in question was his residence, and that he kept practically all of his personal belongings there, although he usually slept in a one room building on the ranch generally used as a feed house. He said that he had been deer hunting on the ranch the afternoon of November 22nd, carrying his .257 Weatherbee Magnum rifle with him. He arrived at

---

1. The pathologist who performed the autopsies testified that the mid-axillary line divides the body in halves, from armpit to armpit.

his residence after dark, and noticed that a light was burning in the kitchen. He also saw that a board had been pried from a window, and realized that there had been a break-in. He approached closer to the window, and saw that the kitchen "seemed to be completely filled with rough looking men who were complete strangers to me." They appeared to be eating his food[2] and rummaging around among his belongings. He testified that as he was watching them through the window one of the men saw him and threw a "weapon"[3] with all his might at him. He stated that "this sudden attack frightened me to the extent that I leaped backwards and immediately raised my rifle to my shoulder and at the same time, he turned toward the northwest corner of the room where I had left a loaded .22 rifle, and I shot him and he fell to the floor." According to appellant, after he fired the first shot "there was a wild rush toward the window . . . I felt terrified, that I was under attack" and he continued to shoot "until there was no more sign of attack in the room . . . everything was quiet." He then entered the house, and one of the men "that was in there faking dead" grabbed his rifle, and "I jerked back and fired" and also fired another shot at one man that "attempted to leap on my back."

The court included in his charge instructions on the law of justifiable homicide inflicted for the purpose of preventing burglary and theft at night, see Article 1222, Vernon's Ann.P.C., infra, and on the law of self-defense.

In his sixth ground of error appellant argues that the court erred in refusing to grant his motion for an instructed verdict at the close of the evidence. The motion was based on his defense of justifiable homicide under the provisions of Article 1222, V.A.P.C.[4]

Appellant takes the position that the evidence shows *as a matter of law* that it reasonably appeared to him at the time of the shooting that deceased was committing burglary or theft at night, or was about to do so, and that he shot to prevent the commission of such offense or offenses. We do not agree that the evidence established this as a matter of law. See Lorraine v. State, 163 Tex.Cr.R. 555, 294 S.W.2d 842.

█ To commit burglary, the entry into the house must be accompanied with the intent to commit theft, or a felony. See Articles 1389, 1390, 1391, V.A.P.C. The intent with which deceased and his companions entered was a contested issue, and was not proved as a matter of law. Likewise,

---

2. However, he testified that "they evidently carried a few tortillas, from experience I have had with other ones."

3. Appellant on cross-examination identified this "weapon" as being a 14 inch long file with a pointed end *that he used in chopping arrowheads.*

4. Article 1222, V.A.P.C., as it read at the time of the offense and trial, read, in part:

"Homicide is justifiable when inflicted for the purpose of preventing . . . burglary and theft at night . . . when the killing takes place under the following circumstances:

"1. It must reasonably appear by the acts or by words coupled with the acts of the person killed that it was the purpose and intent of such person to commit one of the offenses above named.

"2. The *killing must take place while* the person killed was in the act of committing the offense, or after some act done by him showing evidently an intent to commit such offense.

"3. It must take place before the offense committed by the party killed is actually completed, except that in case of rape the ravisher may be killed at any time before he has escaped from the presence of his victim, and except also in the cases hereinafter enumerated.

\* \* \* \* \* \*

"8. In cases of burglary and theft by night, the homicide is justifiable at any time while the offender is in the building or at the place where the theft is committed, or is within reach of gunshot from such place or building."

although a fact issue may have been raised, the proof does not *conclusively* show any intent to commit theft. Likewise, the evidence fails to establish *conclusively* that deceeased or his companions were committing theft, or that it reasonably appeared to appellant that they were.

Appellant's defense of justifiable homicide is based on his own testimony about the events surrounding the shooting. His testimony merely raised fact issues, and the court instructed the jury on the law concerning them. See Lorraine v. State, supra.

■ Furthermore, it has long been the law that Article 1222, V.A.P.C., supra, and its predecessors are not applicable to cases where the killing is upon malice. It is only when the homicide is inflicted for the purpose of *preventing* one of the offenses mentioned in the statute, and not where the real motive and design is to kill the deceased with malice, that one is justified under the article in taking life. McKinney v. State, 96 Tex.Cr.R. 342, 257 S.W. 258; Garcia v. State, 91 Tex.Cr.R. 9, 237 S.W. 279; Surges v. State, 88 Tex.Cr.R. 288, 225 S.W. 1103 (on rehearing); Laws v. State, 26 Tex.App. 643, 10 S.W. 220; Gilleland v. State, 44 Tex. 356. Also see Davis v. State, Tex.Cr.App., 467 S.W.2d 457.

In *Garcia,* supra, the Court said:

"If the killing was upon malice, and not to prevent a theft or the consequence of theft, it would not be justified under the statute, although a theft by night was actually being committed by the deceased at the time he was killed." Citing authorities.

■ Proof of the intentional shooting of deceased with a deadly weapon is sufficient to authorize a verdict of malice. Hemphill v. State, Tex.Cr.App., 505 S.W.2d 560; Newman v. State, Tex.Cr.App., 501 S.W.2d 94; Taylor v. State, Tex.Cr.App., 470 S.W.2d 693; Mendiola v. State, 158 Tex. Cr.R. 621, 259 S.W.2d 192. The jury found

from the evidence that appellant acted with malice in shooting deceased.

The trial court correctly overruled appellant's motion for an instructed verdict. The sixth ground of error is overruled.

Appellant's seventh and eighth grounds of error raise the contention that the court's charge erroneously instructed the jury on justifiable homicide under the provisions of Article 1222, V.A.P.C. enumerated, supra. Appellant states in his brief as to these two grounds of error:

"The evidence with respect to appellant's defense of justifiable homicide under Art. 1222 P.C. (in effect at the time in question) is undisputed. Thus, the foregoing grounds of error present this question solely with a question of law."

We have heretofore found that appellant's evidence is not undisputed, and that issues of fact were raised concerning the application of the statute.

■ The court's charge on appellant's defense that he shot deceased for the purpose of preventing burglary and theft at night properly and sufficiently explained the law as set forth in Article 1222, V.A.P.C., supra, and fully protected appellant's rights in that respect.

The seventh and eighth grounds of error are overruled.

As stated by appellant in his brief, his ninth, tenth, eleventh, twelfth and thirteenth grounds of error "all turn on appellant's position that under the undisputed facts as presented in the court below, malice or previously formed intent or plan (1) was not present in this case which conclusively demonstrated justifiable homicide under then Article 1222, P.C., and (2) the State failed to prove malice beyond a reasonable doubt. Thus they are presented together."

As we have previously stated, the defense of justifiable homicide was injected into the

case by the testimony of appellant. The jury, as the triers of the facts, had the option of believing all of appellant's testimony, none of it, or any portion of it. Pope v. State, Tex.Cr.App., 505 S.W.2d 556.

■ The State's evidence presents a case of an unprovoked killing of five unarmed men by shooting them in the back portion of their heads or bodies with a high powered hunting rifle at close range. Thereafter, the appellant made the remark, "That's kind of cold blooded, but I did it, and I am ready to go." As heretofore stated, the evidence raised the issue of intent and malice, and the court did not err in charging on murder with malice. Article 45, V.A.P.C.; Hartman v. State, Tex.Cr.App., 507 S.W.2d 553; Hemphill v. State, Tex.Cr.App., 505 S.W.2d 560; Machado v. State, Tex.Cr.App., 494 S.W.2d 859.

The ninth, tenth, eleventh, twelfth and thirteenth grounds of error are overruled.

Appellant, in his fourteenth ground of error contends that the court erred in admitting in evidence his statements that (1) he had shot five men who appeared to be Mexican aliens, and (2) that it was kind of cold-blooded, but he had done it and was ready to go. He claims that he was at that time under arrest, and that he reasonably considered himself in custody and deprived of his freedom, and that he had not been advised of his Miranda and Article 38.22, V.A.C.C.P., rights.

A hearing was had in the absence of the jury to determine the admissibility of these statements. The record reflects that appellant was not under arrest or in custody and did not reasonably consider himself to be deprived of his freedom of movement at the time the statements were made. As we stated in Tilley v. State, Tex.Cr.App., 462 S.W.2d 594, "We hold that at this stage of the investigation the record reveals that there was not a shift from the investigatory to the accusatory or custodial stage." See also Steele v. State, Tex.Cr.App., 496 S.W.2d 66; Brown v. State, Tex.Cr.App., 475 S.W.2d 938, 950–957; Jones v. State, Tex.Cr.App., 442 S.W.2d 698; Taylor v. State, Tex.Cr.App., 420 S.W.2d 601. Cf. Ancira v. State, Tex.Cr.App., 516 S.W.2d 924.

■ The record shows that the remarks of appellant were volunteered by appellant while he was not in custody or under arrest, and while he did not reasonably so consider himself. The court did not err in finding the statements were made voluntarily, and in ruling them admissible.

The fourteenth ground of error is overruled.

■ In his fifteenth ground, appellant complains of the failure to define the term "occupant" in the charge. "Occupant" appears in the charge only once, where, in defining the term "burglary" in connection with appellant's defensive issue that he shot to prevent burglary, the charge read:

"By the term 'entry into a house' is meant every kind of entry but one made with the free consent of the occupant . . . ."

"Occupant" is a word of everyday usage and its meaning is a matter of common knowledge. Cf. Ramirez v. State, Tex.Cr. App., 518 S.W.2d 546; Wells v. State, Tex. Cr.App., 516 S.W.2d 663. The court did not err in declining to define it.

■ Appellant also contends that the court erred in failing to instruct the jury that it is not necessary to actually take property in order to constitute burglary. The court's definition of burglary together with its explanatory remarks concerning "breaking," "entry into a house," "intent to commit theft" and "burglarious intent" make it clear that property need not be taken in order to constitute burglary.

The fifteenth ground of error is overruled.

In his sixteenth ground, appellant contends that the court committed reversible

error in overruling his challenges for cause to jurors Roberson and Woodal. He asserts that, as a result, he was forced to accept these two objectionable jurors, since he used all of his peremptory challenges on other members of the panel.

The panel members were examined separately, and the jury was selected after the required number had qualified. Appellant peremptorily struck ten members of the panel, but did not strike Roberson or Woodal, and both served on the trial jury.

As to Roberson, appellant contends she became subject to challenge for cause when she stated, in answer to a question by defense counsel, that she had doubts as to whether or not she could follow the court's instructions on appellant's defensive theory of justifiable homicide. When she made this answer, an unreported conference was had at the bench, but the record does not show any challenge at that time. After the conference at the bench, the court stated that he didn't think she understood the question, and after explaining to her that he would instruct the jury as to the law applicable to the evidence, she stated that she would follow the court's instructions as given in the charge, whether she liked it or not, and be governed by such instructions. Appellant's challenge for cause, first made in the record at this time, was overruled. Although opportunity was given appellant to continue to examine Roberson, he did not do so. No error is shown.

Juror Woodal, on voir dire, stated he had formed an opinion from what he had heard and read concerning appellant's guilt or innocence, and at first equivocated some as to whether it would influence his verdict. However, he stated definitely upon examination by the court that he would not, as a juror, be influenced by anything he had heard or read about the case, and in answer to a question by defense counsel, answered as follows:

"Q I gather then that you feel that even though you have had previous expo-

sure that you can overcome that and try to render a fair and impartial verdict, based on what you hear here in the courtroom, and not what you heard previously?

"A I think I can, I know I can.

"Q You know you can?

"A Yes."

The testimony of Woodal on voir dire, when taken as a whole, does not reflect that he was disqualified from serving on the jury. Scott v. State, Tex.Cr.App., 490 S.W.2d 578.

Furthermore, as to appellant's contentions concerning jurors Roberson and Woodal, the record does not reflect that appellant requested additional peremptory challenges to use on these jurors, or that the court would not have given additional challenges if request had been made. In Sifford v. State, Tex.Cr.App., 505 S.W.2d 866, the Court stated:

"Assuming the record shows that the prospective juror was subject to challenge for cause, it does not reflect that the appellant requested an additional challenge after he had exhausted all of his peremptory challenges, or that he was forced to take an objectionable juror. No error is shown. See Williams v. State, 481 S.W.2d 119 (Tex.Cr.App.1972); Bayless v. State, 166 Tex.Cr.R. 479, 316 S.W.2d 743 (1958)."

See, also, Chappell v. State, Tex.Cr.App., 519 S.W.2d 453; Ward v. State, Tex.Cr.App., 505 S.W.2d 832; Hollis v. State, Tex.Cr.App., 509 S.W.2d 372; Story v. State, Tex.Cr.App., 502 S.W.2d 764.

The sixteenth ground of error is overruled.

In five grounds of error, appellant contends that the court erred in overruling his motion for a change of venue.

In his said motion, supported by affidavits of two compurgators, appellant alleged (1) that there existed in Webb County so

great a prejudice against him that it was improbable he could obtain a fair and impartial trial, and (2) due process of law and appellant's constitutional guarantee of trial by a fair and impartial jury would be denied if he were put to trial to a jury in Webb County because there was a reasonable likelihood of prejudice both against the appellant personally and against his case.

A hearing was had on appellant's motion to change the venue, and the State's reply thereto, on April 5, 1973, four and a half months after the commission of the offense and three months eleven days before the trial began on July 16, 1973. At the hearing, it was stipulated that the population of Webb County in 1971 was 72,500, with 70,000 being residents of Laredo, and in 1972, the same ratio existed as to Laredo and the county, with the population of Laredo being between 70,000 and 75,000. The district clerk of Webb County testified that in 1972 approximately 23,000 names of prospective jurors were placed in the jury wheel. The evidence reflects that approximately 85% of the population of Webb County had surnames of Latin-American origin.

Appellant called as witnesses a number of people in the news media, including representatives of The Laredo Times, the local television station, and the local radio station. Copies of articles concerning the killing from the November 24 to 29th, inclusive, editions of The Laredo Times, with photographs, were placed in evidence. The paper had a circulation of about 12,500 in Webb County. Bill Baker, publisher of The Times, testified that he did not consider that the articles were of such a nature as to prevent appellant from securing a fair and impartial trial in Webb County. We find, from a review of these articles, that although they reflect a very serious and tragic occurrence of great news interest to the public, they appear to present a fair, noninflammatory account published for the purpose of informing the public of current events, and that the articles gave publicity to appellant's contention that he shot to prevent theft and burglary, as well as to the State's claim of murder.

James Cathey, general manager of the local television station, identified copies of broadcasts of November 23, 24, 25, 26, 27 and 28 concerning the offense. Although he had talked to many local citizens about the occurrence and found sentiment to be strongly against appellant, he had not talked to anyone who was on the witness list, and felt that he could render a fair and impartial verdict as a juror, and stated: "I certainly think an Anglo man who shoots a Mexican can get a fair trial in Webb County." Cathey said that the television broadcasts were strictly factual, and were not distorted or inflammatory. We agree.

On the other hand, L. H. Guerra, newscaster for the station, who had talked to about eighty people, mostly in 1972, about the case, thought that there was racial prejudice against appellant, and that it was not probable that he could get a fair trial in the county.

Dave Gearheart, news director of the KVOZ radio station in Laredo, identified transcripts of radio broadcasts of November 23–29, inclusive, concerning the killing, which were introduced in evidence. He did not consider the newscasts to be inflammatory. We have reviewed them, and find that they, like The Times' accounts, also appear to present a fair, noninflammatory account of the case.

John Smally, news director of KLAR radio station in Laredo, identified the transcripts of the newscasts of that station on November 23 to 29, inclusive, concerning this case. We reach the same conclusions of these as we do to the newscasts of KVOZ.

Lezandro Guerra, Jr., who said he had talked to about 80 or 90 people in the county about the killing, three-fourths of the conversations in 1972, was definitely of the opinion that there was race prejudice against appellant, and that he probably

would not receive a fair trial from a jury in the county. He stated that the further in time from the date of the offense, the less the talk of the case.

Evan B. Quiros, a rancher and businessman, had heard people talking about the offense frequently right after it happened, but less frequently "lately." He had talked about the killing with about 80 people altogether, all of their remarks being unfavorable to appellant. His own opinion was unfavorable. He did not consider the publicity given the case by the news media to be prejudicial or inflammatory, but did find that the majority of those he had talked with "had a very strong opinion about it." He had not talked to any of those called as witnesses in the case, and he did not think that the people with whom he talked had.

Felix Garcia, a banker, another witness, had talked with about 50 people about this killing. These conversations were frequent in the beginning, but became less frequent as time passed. Some of the talk was about a prior conviction of appellant on a murder charge. Most of the people with whom he had talked had formed an opinion unfavorable to appellant.

Eloy Garcia, a Laredo businessman, had heard many unfavorable remarks concerning appellant and had discussed his prior conviction of murder. In his opinion, appellant could not receive a fair trial in Webb County. He felt that the people he had talked to were influenced by pictures in the newspapers.

Amber Yeary, also called to testify by appellant, stated that he had heard much discussion of the case, more frequently close to the time of the occurrence, and had discussed with others appellant's prior conviction. From his talk with customers and friends, he had reached the opinion that "if they are proportionate representation of the county as a whole" it would be very diffi-

cult for appellant to have a fair trial in Webb County. He agreed that the fact that he was doing business with a large number of citizens of Mexico had some influence on his opinion.

Webb County is located on the border between Texas and Mexico, and the city of Nuevo Laredo is just across the Rio Grande in Mexico. Admitted in evidence were extracts from the November 25–30, inclusive, edition of El Diario, a newspaper published in Nuevo Laredo in the Spanish language. We have reviewed the translations of these articles and have seen the photographs accompanying them, and find the articles and photographs much more inflammatory and prejudicial against appellant and less newsworthy than the articles from The Times and the transcripts of the television and radio broadcasts. Although El Diario had a circulation of about 2,000 in Webb County, there was little evidence of any influence its articles had on qualified jurors of Webb County.

At noon on April 5, the court announced that it would hear no more evidence at this pre-trial hearing, but said: "I will hear further evidence if you have any to present on April 23rd [5] in connection with your motion for change of venue." The court also announced that it would wait until after the voir dire of the jury panel before ruling in order to determine the difficulty of securing a fair and impartial jury in Webb County. Appellant requested the court to rule on the evidence then before it, and excepted to his refusal to do so.

On July 16, when the case was called the court announced before the examination of the jury panel that it would hear appellant's motion. Appellant introduced further record evidence, including a copy of The Laredo Times for November 26 and translations of the copies of El Diario previously introduced. Appellant again asked the court for a ruling on his motion for a

---

**5.** The trial was originally set for April 23rd. However, after this hearing, on motion of appellant it was continued, and reset for July 16th.

change of venue, but the court again stated that he would make his ruling when the voir dire examination of the jury panel was completed.

The record of the voir dire of the jury panel is before us. It reflects that 33 jurors qualified for service on the jury out of a total of 72 veniremen examined. Of these 72, eighteen disqualified because they had formed an opinion of the guilt or innocence of the accused. Five were excused on challenge by the State for answering that the absence of an eyewitness to the killing would cause them to have a reasonable doubt, regardless of other evidence. Three stated they would be prejudiced against the victims who had entered this country illegally. Two were prejudiced against the law of justifiable homicide. Others were excused by the court by agreement of counsel for equitable reasons. Appellant cites only two instances in which members of the panel were ruled qualified to serve over his objection, these being Roberson and Woodal mentioned in his sixteenth ground.

It is appellant's contention that the undisputed evidence established the truth of his allegations as evidenced by:

(1) widespread and inflammatory coverage by the local news media, to-wit, radio, television and newspapers;

(2) widespread discussion of the facts of the case by and among citizens of the county; and

(3) racial prejudice against appellant.

Appellant also contends that the court erred (2) in "abruptly" terminating the hearing on April 5 before he had introduced all of his evidence; (3) also in refusing to rule on the motion at the close of the hearing; and (4) in denying the motion to change venue at the close of the voir dire of the jury panel.

Although the State did not place any witnesses on the stand it did vigorously cross-examine appellant's witnesses. As a result, as demonstrated in the above summary, the evidence does not establish beyond dispute that appellant would not be likely to obtain a fair and impartial trial before a Webb County jury. The trial court did not commit error in holding its ruling on a change of venue in abeyance pending the examination of the jury panel and stating that it would change the venue on its own motion if it found from the pre-trial evidence and the voir dire of the panel that a fair and impartial trial could not be had in Webb County. See Garcia v. State, Tex.Cr.App., 513 S.W.2d 82; Bridges v. State, Tex.Cr.App., 471 S.W.2d 827; Clemons v. State, Tex.Cr.App., 398 S.W.2d 563, cert. den., 384 U.S. 1015, 86 S.Ct. 1974, 16 L.Ed.2d 1037, reh. den., 385 U.S. 894, 87 S.Ct. 25, 17 L.Ed.2d 128; Hagans v. State, Tex.Cr.App., 372 S.W.2d 946; Phillips v. State, 168 Tex.Cr.R. 463, 328 S.W.2d 873.

We recognize that the question of a change of venue is one of constitutional dimension and the test to be applied by the court is no longer whether prejudice found its way into the jury box at the trial. See Bridges v. State, supra. In Morris v. State, 488 S.W.2d 768 (Tex.Cr.App.1973), the Court quoted from Pamplin v. Mason, 364 F.2d 1 (5th Cir.) as follows:

" 'As we read the Supreme Court cases, the test is: Where outside influences affecting the community's climate of opinion as to a defendant are inherently suspect, the resulting probability of unfairness requires suitable procedural safeguards, such as a change of venue, to assure a fair and impartial trial. As the Supreme Court stated in Sheppard v. Maxwell [384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600]:

' "Due process requires that the accused receive a trial by an impartial jury free from outside influences. Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts

must take strong measures to ensure that the balance is never weighed against the accused, * * * [W]here there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, *the judge should continue the case until the threat abates,* or transfer it to another county not so permeated with publicity. * * * If publicity during the proceeding threatens the fairness of the trial, a new trial should be ordered." 384 U.S. at 362, 86 S.Ct. at 1522, 16 L.Ed.2d at 620.'" (Emphasis added).

The opinion in *Morris* continues:

"In Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751, Justice Clark, speaking for the Court, wrote that it is not required that jurors be totally ignorant of the facts and issues involved in this day of widespread and diverse methods of communication. He also noted that an important criminal case can be expected to arouse interest of the public in the vicinity and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.

* * * * * *

"Our courts cannot and do not operate in a vacuum. Courts deal with people and crimes which are newsworthy. To require a trial of jurors who had never heard of a highly publicized crime would be impractical if not impossible. Certainly, it was never intended that jurors were to be selected from those who did not read newspapers or keep up with current events through other media. Jurors selected from such a group, if there are enough to be called a group, would not be representative. To hold otherwise would be to hold that the perpetrator of a very highly publicized crime such as the assassination of a president, a governor or any

widely known person could never be tried."

See, also Garcia v. State, supra; Creel v. State, Tex.Cr.App., 493 S.W.2d 814; Taylor v. State, Tex.Cr.App., 420 S.W.2d 601.

It is significant in view of the emphasized portion of the above quote that the witnesses at the pre-trial hearing stressed the fact that most of the publicity and talk of the instant case occurred at the time or shortly after the offense occurred, and decreased later. The hearing was held four and a half months after the killing and over three months before the trial. Thus, almost all of the publicity and most of the discussion proved at the hearing occurred between seven and eight months prior to the trial. This was also noted by the Court in Clifford v. State, Tex.Cr.App., 424 S.W.2d 233,[6] when it said:

"We also note that the jury was not selected until some 4 months after the hearing on the motion for change of venue, 5 months after the trial in Denton County, and some 10 months after the killing and assault."

As to appellant's contention that the publicity that he had theretofore been convicted of another murder prejudiced his case, evidence of such conviction was admitted at the guilt stage of the trial without objection, and the trial jurors had this fact before them in their deliberations.

We have considered all of the contentions made by appellant in these five grounds of error and find that reversible error has not been shown. Having considered the evidence introduced at the pre-trial hearing, examined the contents of the newspapers, television and radio coverage in evidence, and read the voir dire of the jury panel and noticed the lack of difficulty in securing a qualified jury, we conclude that when the test set forth in the cases heretofore cited is applied the court did not abuse its discre-

---

**6.** In both Garcia v. State and Clifford v. State the Court took note of the fact that the defendant was satisfied enough with the

jury to elect to have it assess the punishment.

tion in overruling appellant's motion for a change of venue either at the end of the pre-trial hearing or at the close of the voir dire examination.

The judgment is affirmed.

Opinion approved by the Court.