Alton VON BYRD, Appellant,

v.

The STATE of Texas, Appellee.

No. 58385.

Court of Criminal Appeals of Texas, En Banc.

July 12, 1978.

Rehearing En Banc Denied Sept. 20, 1978.

John W. Mitchell, San Augustine, for appellant.

Bill A. Martin, Dist. Atty., Newton, for the State.

## OPINION

ROBERTS, Judge.

This is an appeal from a conviction for capital murder.[1] The jury answered the special answers prescribed by Article 37.-071(b), Vernon's Ann.C.C.P.,[2] in the affirm-

---

1. V.T.C.A., Penal Code, Section 19.03(a)(2).

2. Article 37.071(b), Vernon's Ann.C.C.P., states:

"(b) On conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:

ative; accordingly, punishment was imposed at death.

The appellant contends that: (1) the trial judge abused his discretion by refusing to grant the appellant's motion for change of venue; (2) forty-four prospective jurors were excluded in violation of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); (3) the trial judge erred by refusing to grant the appellant's challenge for cause of prospective juror Harold Brantley; (4) the trial judge erred by granting the State's challenge for cause of prospective juror Winford Bailey; (5) the trial judge erred by refusing the appellant's motion for additional peremptory challenges; (6) the trial judge erred by failing to suppress the appellant's written confession; (7) the evidence was insufficient to support the conviction; (8) the evidence pertaining to special issue No. 2—Article 37.071(b)(2), Vernon's Ann.C.C.P.—was insufficient to support the jury's affirmative response thereto; (9) the trial judge erred by refusing to grant the appellant's motion to appoint a psychiatrist, not in the employ of the State of Texas, to examine the appellant; (10) the trial judge failed to sustain the appellant's objection to the testimony of a court-appointed psychiatrist at the punishment stage of the trial; and (11) the trial judge erred by allowing June Yeates to testify at the punishment stage of the trial. We affirm.

The evidence reflects [3] that on the evening of June 5, 1976, the appellant had been drinking and playing pool. Sometime after 2:00 a. m., on June 6, 1976, the appellant stopped by Linda Price's house. The appellant knocked on the front door, and when Price did not answer, the appellant went to a window and knocked and yelled for Price. The appellant went back to the front door and Price, who was dressed in a nightgown and house robe, was standing in the doorway behind the screen door. Price and the appellant talked awhile and then the appellant asked Price for a glass of water and some matches. The appellant sat on Price's front porch and smoked a number of cigarettes while the conversation continued. The conversation eventually focused upon a trip that Price and the appellant's wife had taken to Wichita Falls.[4] The appellant was attempting to ascertain whether his wife had gotten pregnant during the trip. Price told the appellant that nothing had happened during the trip. The appellant grabbed Price by the shoulders and "threw her down on the floor" so that she was lying on her back. The appellant again told her that he wanted to know "what happened at Dallas." Price said, "Nothing." The appellant responded, "I ought to f_k you." Price told the appellant, "You do and I'll see you in court." The appellant again told Price that he just wanted to know what happened in Dallas. Price told the appellant it was, "None of your damn business." The appellant then hit Price in the nose or mouth. Price, who was bleeding from the appellant's blow, started crying. The appellant tried to calm Price.

(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;
(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and
(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased."
The appellant moved to have the third special issue—Article 37.071(b)(3), Vernon's Ann.C.C.P.—deleted from the court's charge. The State did not object to the appellant's motion. Accordingly, the trial judge eliminated the third special issue from the charge to the jury. Thus, the jury returned an affirmative response to only Article 37.071(b)(1 and 2), Vernon's Ann.C.C.P.

3. A great majority of the facts surrounding the evening of the murder were established through the appellant's written confession and his testimony at trial. The appellant admitted that he killed Linda Price, but denied that he had kidnapped her.

4. The appellant referred to this trip as the "Dallas" trip.

Price then proceeded into the bedroom to get dressed. She went into the bedroom and the appellant stood in the doorway of the bedroom looking towards the front door. Price then pulled a .22 caliber pistol out of a drawer, pointed it at the appellant, and told him to "get the hell out of here." The appellant turned around and Price fired the pistol at him. The appellant lunged for the gun and pushed it away from himself as Price fired a second shot.[5] The appellant took the gun away from Price, and he and Price subsequently left the house in the appellant's car.

During the remaining hours of darkness, the appellant and Price drove around the San Augustine area. The appellant stopped his vehicle several times and several acts of sexual intercourse and deviate sexual intercourse occurred.[6] The appellant finally stopped in a highly wooded area. The appellant and Price went into the woods. At that point, the appellant told Price that he was going to kill his wife. Price pleaded with him not to kill his wife and the appellant told her that he "was going to tie her up." Price asked how the appellant was going to tie her up since he did not have any rope, and the appellant told her that he had learned a "trick" while he was a Marine. The appellant subsequently had Price lie on the ground with her legs around the base of a tree. He then shot her through the eye with Price's .22 caliber pistol. Price died from the bullet wound. The appellant then fled the scene of the crime.

On Sunday, June 6, 1976, the deceased's mother, Mrs. Lovine Price, attempted to call the deceased. When she was unable to contact the deceased, the deceased's sister, Debbie Price, went to the deceased's house. She knocked on the door, but there was no answer. Debbie Price tried the door and discovered that is was unlocked. She went inside the deceased's house, saw blood on the living room rug and saw the deceased's bed clothes, which also had blood stains on them, lying on the deceased's bed. Debbie Price called her parents, who then proceeded to the deceased's house. Mrs. Price called Officer Tindall of the San Augustine Police Department.

A massive investigation ensued. On June 10, 1976, the appellant gave Officer Tindall consent to search his car. Hair follicles were removed from the vehicle. At trial there was expert testimony that there was a strong probability that some of the hair follicles removed from the appellant's car were from the deceased.

On Friday, June 18, 1976, the appellant was arrested, in connection with an aggravated assault,[7] by Officer Cook of the Department of Public Safety. At that time, Officer Cook took the appellant before a magistrate who read the appellant his rights pursuant to Article 15.17, Vernon's Ann.C.C.P., and set the appellant's bail at $15,000. Immediately thereafter, Cook transported the appellant to Nacogdoches for interrogation and a polygraph examination. When they arrived in Nacogdoches, Cook read the appellant his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Approximately five hours after Cook and the appellant had arrived in Nacogdoches, Cook took the appellant to Groveton in connection with a felony theft. When they arrived in Groveton, Cook again informed the appellant of his *Miranda* rights, and the appellant's bail in connection with the felony theft was set at $5,000. Cook left the ap-

5. Both bullets were recovered from Price's bedroom. Although the appellant told the police where he had put the pistol, the police were unable to recover it.

6. We find it unnecessary to detail these events. It is sufficient to note that the police discovered evidence to substantiate the events described by the appellant.

7. The alleged aggravated assault involved a fight the appellant had with Charles Ener on June 16, 1976. The fight was apparently due to Ener's prior involvement with the appellant's wife.

pellant in the Trinity County jail in Groveton until Tuesday, June 21, 1976.[8]

On June 21, 1976, Officer Cook transported the appellant back to San Augustine. On Friday, June 25, 1976, the appellant was interrogated by Officer Tindall. Tindall warned the appellant of his rights under *Miranda* before any interrogation began. The appellant told Tindall that he wanted to make a statement. Before Tindall would permit the appellant to make a statement, he called Officer Cook. Cook proceeded to the San Augustine jail and read the appellant his *Miranda* rights. The appellant then made an oral statement.

Immediately after the appellant made the oral statement, Cook and Tindall had the appellant lead them over the roads which he took during the night of the murder. Before the appellant could lead the officers to the location where he had killed Price, however, darkness set in and the search was discontinued.

The officers arrived back at the San Augustine jail at approximately 10:00 p. m. At that time, Judge Reynolds was summoned to read the appellant his rights pursuant to Article 15.17, Vernon's Ann.C.C.P. At that time, the appellant was informed that he was accused with the offense of murder. Immediately thereafter, the appellant began to make a written confession which set forth the details of the offense. On the following day, June 26, 1976, the appellant led the officers to the body of the deceased. On June 28, 1976, the appellant was officially charged by complaint with the capital murder of the deceased, and at that time the appellant was taken before Judge Seale who read the appellant his rights pursuant to Article 15.17, Vernon's Ann.C.C.P.

The defensive testimony revealed that the appellant and the deceased, who was the appellant's sister-in-law, had, on four prior occasions, engaged in sexual intercourse. The appellant admitted that he killed the deceased, but denied that he kidnapped the deceased from her house on the night in question. Rather, Price allegedly went for a ride with the appellant so that they could continue their discussion. The appellant also sought to demonstrate that his confession was obtained illegally because his arrest on the aggravated assault charge and Officer Cook's actions in transporting him to Nacogdoches and the Trinity County jail in Groveton were a pretext to interrogate him about the murder of the deceased.

The jury returned a verdict finding the appellant guilty of capital murder. At the punishment stage of the trial, the State called three witnesses: June Yeates, Dr. J. A. Hunter and Officer Tindall.

June Yeates testified that in January or February of 1973 the appellant knocked on her door at approximately 1:00 a. m. A discussion ensued and it turned out that the appellant was trying to get away from some people who were looking for him. Yeates eventually allowed the appellant, who was carrying a .22 caliber rifle with him, into her kitchen while she got him a glass of water. While she was getting him the water, Yeates felt the appellant put the barrel of his rifle against the small of her back. The appellant told her not to move. After Yeates told the appellant that she would pray for him, the appellant removed the rifle from Yeates' back. Yeates informed the appellant's grandmother, Mrs. Mae Byrd, of the incident. Yeates also testified that she was afraid of the appellant at the time of trial.

Doctor Hunter, a psychiatrist at Rusk State Hospital who had been appointed by the trial judge to examine the appellant prior to trial and who had examined the appellant for thirteen days, testified that the appellant's personality could be classified as passive-aggressive with antisocial

8. The appellant admitted that on Sunday, June 20, 1976, he was allowed a telephone call, but he did not call a lawyer.

features or antisocial with passive-aggressive features. He also testified that there was a high medical probability that the appellant would commit future acts of violence.

Finally, Officer Tindall testified that he had asked the appellant why he killed the deceased and that the appellant had responded, "Well, if it hadn't have been her, it would've been somebody else."

The defensive evidence at the punishment stage of the trial consisted of the testimony of Mae Byrd. She testified that she had raised the appellant and that the appellant was not a violent-type person. She also corroborated the testimony of June Yeates.

The appellant's initial contention is that the trial judge erred by failing to grant the appellant's motion for change of venue. The appellant asserts that there existed in San Augustine County so great a prejudice against him that he could not obtain a fair and impartial trial. Article 31.03(1), Vernon's Ann.C.C.P.

On September 20, 1976, a hearing was held on the appellant's motion for change of venue.[9] The evidence introduced by the appellant revealed that the total population of San Augustine County in 1970 was approximately 7,850. The principal towns were San Augustine, with a population of approximately 3,100 and Broaddus, with a population of approximately 400. The San Augustine Rambler, a weekly paper, had a total circulation of approximately 4,000 throughout San Augustine, Shelby, Sabine and Nacogdoches Counties. Approximately 2,400 to 2,600 of those were circulated within San Augustine County. The San Augustine Tribune, a weekly paper, had a total circulation within San Augustine County of approximately 2,850, with additional circulation in surrounding counties. The Beaumont Enterprise Journal, a daily paper, had a circulation of approximately 2,200 to 2,400 in San Augustine County. A number of articles from the foregoing newspapers were introduced which demonstrated that from between June 6, 1976, when the deceased disappeared, and June 26, 1976, when the deceased's body was discovered, an intensive "manhunt" was underway. Moreover, the articles published after the appellant's arrest and confession described the murder as involving "rape" or "sex," and they implied that the appellant had been administered a polygraph examination. Additional evidence revealed that the radio and television media had covered the story. Finally, the appellant called a number of witnesses who testified that, in their opinion, the appellant could not obtain a fair and impartial trial in San Augustine County.

In rebuttal, the State called a number of witnesses who testified that, in their opinion, the appellant could obtain a fair and impartial trial in San Augustine County. The State also was permitted to show that the publicity surrounding at least one prior crime in San Augustine County had re-

---

9. We note that the record does not contain any controverting affidavits which the State may have filed. Thus, the State did not join issue with the appellant. Article 31.04, Vernon's Ann.C.C.P. In *Durrough v. State*, 562 S.W.2d 488, 489 (Tex.Cr.R.1978), we quoted the following from *Cox v. State*, 90 Tex.Cr.R. 106, 234 S.W. 72 (1921):

"The presentation of an application for change of venue, properly verified, makes it incumbent upon the trial judge to change the venue, unless the application is controverted in the manner prescribed by statute, or unless the controverting affidavit is waived by the accused, and evidence heard justifying the denial of the motion. *Moore v. State*, 46 Tex.Cr.R. 57, 79 S.W. 565; *Carr v. State*, 19 Tex.App. 656, 39 Tex.Cr.R. 573; *Davis v. State*, 19 Tex.App. [201] 222; *Logan v. State*, 39 Tex.Cr.R. 573, 47 S.W. 645; *Lemons v. State*, 59 Tex.Cr.R. 299, 128 S.W. 416."

In the present case, however, the trial judge held a hearing on the uncontroverted motion. The appellant failed to object to the hearing on the basis that the State's failure to file controverting affidavits entitled him to a change of venue as a matter of law. We view the appellant's failure to object at that time as a waiver of the State's failure to file a controverting affidavit. See also *Stapleton v. State*, 565 S.W.2d 532 (Tex.Cr.App.1978).

ceived greater publicity than the present case.

The evidence raised fact issues concerning whether the appellant could obtain a fair and impartial trial before a jury composed of people from San Augustine County. These issues were decided adversely to the appellant's contentions when the trial judge, as the trier of the facts, overruled the motion for change of venue. *Freeman v. State*, 556 S.W.2d 287 (Tex.Cr.App.1977); *Ransonnette v. State*, 522 S.W.2d 509 (Tex. Cr.App.1975).

However, the appellant renewed his motion for change of venue four times after it was originally overruled: once at a subsequent pre-trial hearing, twice during the voir dire of the jury panel, and finally upon completion of the jury selection process.[10] Each time the motion for change of venue was overruled.

In *Freeman v. State*, supra at 296, we quoted the following from *Sheppard v. Maxwell*, 384 U.S. 333, 362, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966):

"Due process requires that the accused receive a trial by an impartial jury free from outside influences. Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused . . . ."

■ As in *Freeman*, we find it proper to consider the voir dire examination of the prospective jurors to determine whether the appellant was in fact tried by an "impartial

jury free from outside influences." See also *Adami v. State*, 524 S.W.2d 693 (Tex. Cr.App.1975).

The voir dire examination reveals that a special venire of 350 people was called in the case.[11] A total of 110 people apparently appeared for jury duty. One person, Winford Dawn Bailey, was disqualified, without voir dire examination and over the appellant's objection,[12] as being mentally unfit for jury duty. Thus, 109 prospective jurors were examined by the attorneys for the State and the appellant. The following represents a summary of the voir dire questioning of the 109 prospective jurors:[13] (1) 69 had either heard or read about the case, 1 might have read about the case, 3 had neither heard or read about the case, and 36 were not questioned in this regard; (2) 28 knew the deceased or her family, 22 did not know the deceased or her family, and 59 were not questioned in this regard; (3) 21 were excused upon challenge for cause, 44 were excused on the basis of objections to capital punishment,[14] 1 was excused due to kinship, 1 was excused due to a hearing defect, 15 were peremptorily challenged by the appellant, 15 were peremptorily challenged by the State, and 12 were accepted by the trial judge as jurors.

■ Although we find that a majority of the prospective jurors had heard or read of the case, all of the 12 who served on the trial jury testified that they could and would try the case strictly on the evidence introduced and would base their verdict on what was heard and observed in the courtroom. Moreover, as discussed below in connection with the appellant's second through

---

**10.** The last time the appellant renewed his motion for change of venue occurred after the appellant had exhausted all of his peremptory challenges, his motion for additional peremptory challenges had been denied, and he had indicated that the last prospective juror, who was the last juror accepted and seated, was unacceptable to him.

**11.** A list of the names of the people called was published in the San Augustine Tribune.

**12.** See discussion of appellant's fourth contention, infra.

**13.** The appellant has compiled these statistics. We have reviewed the voir dire examination and have found the appellant's figures to be correct.

**14.** The exclusion of these 44 prospective jurors forms the basis of the appellant's second ground of error discussed below.

fifth contentions, no error is presented in connection with the selection of the members of the jury who served at trial. We find no evidence that the appellant did not receive a trial by an impartial jury free from outside influences. *Cf. Sheppard v. Maxwell,* supra; *Freeman v. State,* supra; *Adami v. State,* supra. Finally, we have examined the contents of the newspaper articles, which, by themselves, do not establish prejudice or require a change of venue, *Freeman v. State,* supra; *Knight v. State,* 538 S.W.2d 101 (Tex.Cr.App.1975), and we cannot conclude that the trial judge abused his discretion in overruling appellant's motion for change of venue and in conducting the trial in San Augustine County. Appellant's first contention is overruled.

■ The appellant's second contention is that forty-four jurors were excluded in violation of the standards set forth in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 766 (1968). The record reveals that the appellant did not object to the exclusion of any of the forty-four jurors. In *Boulware v. State,* 542 S.W.2d 677 (Tex. Cr.App.1976), we held that failure to object to the improper exclusion of prospective jurors waives any error that may have been present. See also *Hovila v. State,* 562 S.W.2d 243 (Tex.Cr.App.1978); *Hughes v. State,* 562 S.W.2d 857 (Tex.Cr.App.1978). Appellant's second contention is overruled.

The appellant's third contention is that the trial judge erred by failing to grant the appellant's challenge for cause with respect to prospective juror No. 18, Harold Brantley.

The voir dire examination of prospective juror Brantley reveals that when the appellant questioned Brantley on the range of punishment applicable to the lesser included offense of murder Brantley responded that he did not think he could consider probation in a proper cause. The appellant then challenged Brantley for cause. The trial judge then elicited from Brantley that he could, in a proper case, consider probation and Brantley stated that he was not opposed to the "probation law." The appellant then exercised a peremptory challenge to exclude Brantley.

Article 35.16(c)(2), Vernon's Ann.C.C.P. provides that a challenge for cause may be made by the defense for the reason that a juror

" . . . has a bias or prejudice against any of the law applicable to the case upon which the defense is entitled to rely, either as a defense to some phase of the offense for which the defendant is being prosecuted or as a mitigation thereof *or of the punishment therefor.*" (Emphasis added)

■ It is well established that the appellant has a right to challenge for cause any juror who could not give the minimum punishment. *Smith v. State* (Tex.Cr.App.1977); No. 56,072 (delivered December 7, 1977); *Woodkins v. State,* 542 S.W.2d 855 (Tex.Cr. App.1976). *Cf. Moore v. State,* 542 S.W.2d 664 (Tex.Cr.App.1976).

■ The record does not support the appellant's contention that the juror was subject to challenge for cause pursuant to Article 35.16(c)(2), Vernon's Ann.C.C.P. *Cf. Moore v. State,* supra; *Hafti v. State,* 487 S.W.2d 745 (Tex.Cr.App.1972). Thus, although the appellant excluded Brantley by using one of his peremptory challenges, and further objected to the last juror empaneled, no error is shown. *Hernandez v. State,* 563 S.W.2d 947 (Tex.Cr.App.1978). Appellant's third contention is overruled.

The appellant's fourth contention is that the trial judge abused his discretion by granting the State's motion to excuse prospective juror Winford Bailey. During the void dire examination of the prospective jurors, the State moved to challenge Bailey pursuant to Article 35.16(a)(4), Vernon's Ann.C.C.P., which states:

"(a) A challenge for cause is an objection made to a particular juror, alleging some fact which renders him incapable or unfit to serve on the jury. A challenge for cause may be made by either the State or the defense for any one of the following reasons:

\*    \*    \*    \*    \*    \*

"4. That he is insane or has such defect in the organs of feeling or hearing, or such bodily or mental defect or disease as to render him unfit for jury service, or that he is legally blind and either the court or the state in its discretion or the defendant or the prospective juror in his discretion is not satisfied that he is fit for jury service in that particular case."

The issue is one of first impression for this Court.

In support of its challenge for cause, the State introduced evidence that Bailey had, on more than one occasion, been committed to Rusk State Hospital as a mentally ill person. The most recent judgment and writ of commitment of temporary hospitalization was dated March 2, 1976. The State also offered the testimony of Sheriff John Hoyt that on October 24, 1976, Hoyt had observed Bailey in his office and that Bailey appeared to be very "unstable" at that time. The jury selection was completed on October 28, 1976; trial on the merits began the same day.

The appellant called Bailey and elicited from her that she had been released from Rusk for "several months" and that she was released with a restoration of sanity. Furthermore, she testified that she was not currently under a doctor's treatment or taking any kind of medication.

The issue is whether, given the foregoing evidence, the trial judge abused his discretion in granting the State's challenge for cause. In *Ex Parte Lovelady,* 152 Tex.Cr.R. 93, 207 S.W.2d 396 (1947), the defendant argued that the foreman of the jury who convicted the defendant was disqualified due to his insanity and therefore that the jury had been comprised of only eleven jurors. This Court there reviewed the evidence, which was voluminous, pertaining to the juror's mental status and concluded that the juror was of sound mind and had the capacity sufficient to qualify him as a juror at the time of the trial. We there noted that a judgment of insanity, even though not set aside by legal proceedings, is not conclusive as to a juror's mental condition and ability to qualify as a juror at the time of trial.

■ The evidence in the present case is very sparse. There was documentary evidence that Bailey had been adjudged insane on March 2, 1976. *Cf.* Article 35.18, Vernon's Ann.C.C.P. There was also evidence that Bailey was "unstable" on October 24, 1976. Of course, Bailey testified that she had been released from Rusk, and that she had undergone a restoration hearing, and that she was not under the care of a doctor or taking medication. However, we conclude that the trial judge, as the trier of fact on the issue of whether Bailey was properly subject to challenge for cause pursuant to Article 35.16(a)(4),[15] did not abuse his discretion by excluding Bailey.[16] Appellant's fourth contention is overruled.

The appellant's fifth contention is that the trial judge erred by refusing to grant the appellant's motion for three additional peremptory challenges. The appellant's motion for three additional peremptory challenges was made after 102 prospective jurors had been questioned and 10 jurors accepted and impaneled. The record reflects that the motion was based on: (1) the allegedly improper inclusion of prospective juror Brantley [see discussion of appellant's third contention above]; (2) the allegedly improper exclusion of prospective juror Bailey [see discussion of appellant's fourth contention above]; and (3) the improper exclu-

---

15. See Article 35.21, Vernon's Ann.C.C.P.

16. Article 35.19, Vernon's Ann.C.C.P., states:
    "No juror shall be impaneled when it appears that he is subject to the second, third or fourth [Article 35.16(a)(4)] cause of challenge in Article 35.16, though both parties may consent." (Explanation added)

Since the only evidence presented by the *appellant* was the testimony of Bailey, which the trial judge was free to disbelieve, we note that it might have been an abuse of discretion for the trial judge not to have excluded Bailey upon the State's challenge for cause. *Cf. Poore v. State,* 524 S.W.2d 294 (Tex.Cr.App.1975).

sion of other prospective jurors on the basis of violations of *Witherspoon v. Illinois,* supra [see discussion of appellant's second contention above].

After the appellant's motion for three additional peremptory challenges was overruled, the record reveals the following: (1) prospective jurors No. 103, No. 104 and No. 105 were successfully challenged for cause by the State; (2) prospective juror No. 106 was accepted by both the State and the appellant; (3) prospective juror No. 107 was successfully challenged for cause by the State; (4) prospective juror No. 108 was successfully challenged for cause by the appellant; and (5) prospective juror No. 109 was accepted by the State, but the appellant, although not challenging prospective juror No. 109 for cause, indicated that prospective juror No. 109 was unacceptable and that if he had an additional peremptory challenge, he would have used it on prospective juror No. 109.

■ We have previously overruled the appellant's second, third and fourth contentions. In so doing, we concluded, *inter alia,* that the appellant was not wrongfully deprived of a peremptory challenge because he was not forced to use a peremptory challenge upon a juror who was shown to be subject to a challenge for cause. Thus, we are unable to conclude that the trial judge abused his discretion in denying the appellant's motion for three additional peremptory challenges. *Cf. Hernandez v. State,* supra. Appellant's fifth contention is overruled.

The appellant's sixth contention is that the trial judge erred by overruling the appellant's motion to suppress his written confession. The appellant's contention is threefold: (1) Article 15.17, Vernon's Ann. C.C.P., was not complied with; (2) Article 38.22, Vernon's Ann.C.C.P., was not complied with; and (3) the dictates of *Miranda v. Arizona,* supra, were not complied with.

The facts surrounding the appellant's arrest, the post-arrest transportation of the appellant from San Augustine to Nacogdoches, Groveton, and finally back to San Augustine, and the events immediately prior to and subsequent to the appellant's written confession have been set forth above.

Article 15.17, Vernon's Ann.C.C.P., states that:

"In each case enumerated in this Code, the person making the arrest shall without unnecessary delay take the person arrested or have him taken before some magistrate of the county where the accused was arrested. The magistrate shall inform in clear language the person arrested of the accusation against him and of any affidavit filed therewith, of his right to retain counsel, of his right to remain silent, of his right to have an attorney present during any interview with peace officers or attorneys representing the state, of his right to terminate the interview at any time, of his right to request the appointment of counsel if he is indigent and cannot afford counsel, and of his right to have an examining trial. He shall also inform the person arrested that he is not required to make a statement and that any statement made by him may be used against him. The magistrate shall allow the person arrested reasonable time and opportunity to consult counsel and shall admit the person arrested to bail if allowed by law."

■ Apparently, the appellant is complaining that he was not taken before a magistrate to be warned of his rights *in connection with the capital murder* until after he had given his written confession. We note, however, that on two occasions prior to his written confession the appellant was taken before a magistrate and warned of his rights under Article 15.17, Vernon's Ann.C.C.P. On at least one of those two occasions, he was specifically warned that he was being accused of murder. Although neither of these focused on the *capital murder charge,* the appellant was warned of his rights pursuant to Article 15.17, Vernon's Ann.C.C.P. Furthermore, it is well estab-

lished that absent a showing of a causal connection between the failure to take an accused before a magistrate pursuant to Article 15.17, Vernon's Ann.C.C.P. and the accused's confession, the validity of the confession is not affected. *Hester v. State,* 544 S.W.2d 129 (Tex.Cr.App.1976); *Shadrick v. State,* 491 S.W.2d 681 (Tex.Cr.App.1973).

■ Also, the trial judge's findings of fact and conclusions of law, which are supported by the record, reflect that the appellant was warned in compliance with Article 38.22, Vernon's Ann.C.C.P. and that the confession was voluntarily given. The violation of Article 15.17, Vernon's Ann.C.C.P., if any, did not invalidate the confession. *Shadrick v. State,* supra.

Finally, the appellant contends that the confession was involuntary due to the "course of conduct employed by the investigating officers." The appellant did not testify to any mistreatment that would render his confession involuntary. Nor did the appellant indicate that he did not give the confession of his own free will. There was no claim or evidence that the appellant had been threatened, placed in fear, promised anything, or otherwise induced or persuaded to give the confession. *Cf. Shadrick v. State,* supra.

■ The trial judge's findings that the confession was voluntarily made and that it was admissible in law and in fact are amply supported by the record. We hold that the appellant's confession was not obtained in violation of Article 15.17, Vernon's Ann.C.C.P., Article 38.22, Vernon's Ann.C.C.P., or the dictates of *Miranda v. Arizona,* supra. Appellant's sixth contention is overruled.

The appellant's seventh contention is that the evidence was insufficient to support the jury verdict. Specifically, the appellant asserts that there was insufficient evidence to show that the appellant murdered the deceased "in the course of committing and attempting to commit a kidnapping."

The evidence, as noted above, reflects that the appellant went to the deceased's house sometime after 2:00 a. m. The appellant eventually knocked the deceased to the floor and hit her. The deceased subsequently got her pistol, told the appellant to "get the hell out of here [her house]," and when the appellant would not leave, the deceased fired two shots from her pistol. The appellant and the deceased eventually left the deceased's house. The only reason advanced to explain why the appellant and the deceased left the deceased's house was that they wanted to continue their discussion about the activities of the appellant's wife during the "Dallas trip." During the course of the morning, the appellant had sexual and deviate sexual intercourse with the deceased. The appellant finally threatened to tie the deceased to a tree.

■ We conclude that the evidence is sufficient to support the jury's verdict. Appellant's seventh contention is overruled.

The appellant's eighth contention is that the evidence was insufficient to support the jury's affirmative answer to special issue No. 2—"whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Article 37.071(b)(2), Vernon's Ann.C.C.P.

The evidence adduced at the punishment stage of the trial, as noted above, established that on one prior occasion the appellant had placed a rifle in the back of June Yeates. Dr. Hunter also testified that based on his characterization of the appellant's personality there was a high medical probability that the appellant would commit future acts of violence. The appellant's oral statement to Officer Tindall—"Well, if it hadn't have been her, it would've been somebody else"—is consistent with the appellant's written confession which states that, "After I [the appellant] told her [the deceased] that I was going to kill her [the deceased] I told her [the deceased] that my old lady, meaning my present wife Donna, had it coming to [sic]." [Explanation added]

■ The foregoing, when coupled with the testimony adduced at trial on the guilt or innocence, *Duffy v. State,* 567 S.W.2d 197 (Tex.Cr.App.1978); No. 57,603 (delivered May 7, 1978) and cases cited therein, convinces us that the evidence was sufficient to support the jury's affirmative answer to special issue No. 2. *Cf. Brock v. State,* 556 S.W.2d 309 (Tex.Cr.App.1977); *Burns v. State,* 556 S.W.2d 270 (Tex.Cr.App. 1977). Appellant's eighth contention is overruled.

The appellant's ninth contention is that the trial judge erred by refusing to grant the appellant's first [17] motion for a psychi-

atric examination to be conducted by a qualified and disinterested expert not in the employ of the State of Texas. The appellant, pursuant to Article 46.02, Section 3, Vernon's Ann.C.C.P., moved the trial judge to appoint a "disinterested" expert to examine the appellant. The trial judge's order reflects that the appellant was ordered to be transported to Rusk State Hospital for the psychiatric examination. The appellant was examined by Dr. Hunter, a state employee at Rusk State Hospital.

The appellant's contention is that Article 46.02, Section 3, Vernon's Ann.C.C.P.,[18] authorizes a trial judge to appoint "disinter-

17. The appellant's first motion was made on September 10, 1976. it requested a "disinterested" expert pursuant to Article 46.02, Section 3. The appellant subsequently filed, on October 21, 1976, a second motion for a psychiatric examination. It did not specifically state whether the appellant was relying upon Article 46.02, Section 3, or Article 46.03, Section 3, Vernon's Ann.C.C.P.

18. In 1965, the Legislature passed Article 46.02, Vernon's Ann.C.C.P. See Acts 1965, 59th Leg., ch. 722, p. 317 at 532. It was entitled "Insanity in Defense or in Bar." It dealt with both the defendant's competency to stand trial and the defense of insanity at the time of the commission of the offense.

By Acts 1967, 60th Leg., ch. 659, Sec. 33, pp. 1748, 1950, effective August 28, 1967, the Legislature added Section 2(f) to Article 46.02, Vernon's Ann.C.C.P. Section 2(f)(1) stated:

"The Court may, at its discretion appoint disinterested qualified experts to examine the defendant with regard to his present competency to stand trial and as to his sanity, and to testify thereto at any trial or hearing in connection to the accusation against the accused."

Then, by Acts 1971, 62nd Leg., ch. 995, Sec. 1, pp. 3026, 3027, the Legislature amended Article 46.02, Section 2(f)(1) to read as follows:

"The Court may, at its discretion appoint disinterested qualified experts to examine the defendant with regard to his present competency to stand trial and as to his sanity, and to testify thereto at any trial or hearing in connection to the accusation against the accused; provided that the Court may not order the defendant to a state mental hospital for such examination without the consent of the head of that state mental hospital."

In 1975, by Acts 1975, 64th Leg., ch. 415, Secs. 1 and 2, pp. 1095 and 1100, the Legislature divided former Article 46.02, Vernon's Ann.C.C.P., into Articles 46.02 and 46.03, Ver-

non's Ann.C.C.P. New Articles 46.02 and 46.03 addressed, respectively, a defendant's competency to stand trial and insanity at the time of the commission of the offense. New Article 46.02, Section 3(a) stated:

"At any time the issue of the defendant's incompetency to stand trial is raised, the court may, on its own motion or motion by the defendant, his counsel, or the prosecuting attorney, appoint disinterested experts experienced and qualified in mental health or mental retardation to examine the defendant with regard to his competency to stand trial and to testify at any trial or hearing on this issue, but the court may not order the defendant to a facility operated by the Texas Department of Mental Health and Mental Retardation for examination without the consent of the head of that facility."

Similarly, new Article 46.03, Section 3(a) stated:

"If notice of intention to raise the insanity defense is filed under Section 2 of this article, the court may, on its own motion or motion by the defendant, his counsel, or the prosecuting attorney, appoint disinterested experts experienced and qualified in mental health or mental retardation to examine the defendant with regard to the insanity defense and to testify thereto at any trial or hearing on this issue, but the court may not order the defendant to a state mental hospital for examination without the consent of the head of the state mental hospital."

Thus, it is apparent that Section 2(f)(1) of former Article 46.02 was incorporated into both Article 46.02, Section 3(a) and Article 46.03, Section 3(a).

Finally, by Acts 1977, 65th Leg., ch. 596, Secs. 1 and 2, pp. 1458 and 1467, Articles 46.02 and 46.03 were amended. However, neither Article 46.02, Section 3(a) nor Article 46.03, Section 3(a), were affected by the amendatory language.

Therefore, although the appellant's trial was held in October 1976, and he is therefore rely-

ested" experts, but that an expert in the employ of the State of Texas cannot, as a matter of law,[19] be a "disinterested" expert. The issue is one of first impression.

Since the appellant contends that Dr. Hunter was not, as a matter of law, "disinterested" we find it unnecessary, indeed unwise, to enumerate factors which might serve to demonstrate that an appointed expert is not "disinterested" within the meaning of Article 46.02, Section 3(a). Rather, we discern three reasons for overruling the appellant's contention.

First, in *Granviel v. State*, 552 S.W.2d 107 (Tex.Cr.App.1976), we addressed the appointment, pursuant to Article 46.02, Section 2(f)(1), Vernon's Ann.C.C.P., [now Article 46.02, Section 3(a)][20] of a psychologist. We there stated that the language of Article 46.02, Section 2(f)(1)—"appoint disinterested qualified experts to examine the defendant"—

". . . clearly means that such expert is not appointed by the court as the expert of the State or the defense, but is the court's disinterested expert. He may appoint such expert at his discretion and without a motion therefore, and either party may subpoena such witness." *Id.* at 115.

Thus, an expert appointed pursuant to Article 46.02, Section 3(a) is the "court's expert." We also note that in 1975 by Acts 1975, 64th Leg., ch. 415, Secs. 1 and 2, pp. 1095 and 1100, the Legislature added, as Article 46.02, Section 3(g), Vernon's Ann.C.C.P., and Article 46.03, Section 3(f), Vernon's Ann.C.C.P., the following:

"When a defendant wishes to be examined by a psychiatrist or other expert of his own choice, the court on timely request shall provide the examiner with reasonable opportunity to examine the defendant."

ing upon Article 46.02, Section 3(a) as it existed at that point in time, our decision herein is applicable to current Article 46.02, Section 3(a).

**19.** There was no evidence in the record to show that Dr. Hunter was not "disinterested" other than that he was in the employ of Rusk State Hospital. We therefore construe the appellant's contention to be that all experts in the

The appellant was indigent. Article 26.05, Section 1(d), Vernon's Ann.C.C.P., states:

"Sec. 1. A counsel appointed to defend a person accused of a felony or a misdemeanor punishable by imprisonment, or to represent an indigent in a habeas corpus hearing, shall be paid from the general fund of the county in which the prosecution was instituted or habeas corpus hearing held, according to the following schedule:

\*     \*     \*     \*     \*     \*

"(d) For expenses incurred for purposes of investigation and expert testimony, a reasonable fee to be set by the court but in no event to exceed $500."

Thus, pursuant to Article 46.02, Section 3(g), Vernon's Ann.C.C.P., and Article 26.05, Section 1(d), the appellant could have obtained experts of his own choice to have examined him.

■ Since the Legislature has provided for experts for both the "court" and the defendant in any given case, we construe the "disinterested qualified expert" language of Article 46.02, Section 3(a) to be a guide for the appointment of experts by trial judges. Given our interpretation of Article 46.02, Section 3(a), it does not necessarily follow that the appointment of an expert in violation of that guideline merits a reversal of the cause,[21] let alone that all experts in the employ of the State are not "disinterested."

■ Second, as noted above in footnote 18, the Legislature, by Acts 1971, 62nd Leg., ch. 995, Secs. 1 and 2, pp. 3026, 3027, amended what was then Article 46.02, Section 2(f)(1) by adding that ". . . the court

employ of the state would not be "disinterested" and hence, would be disqualified under Article 46.02, Section 3(a) as a matter of law.

**20.** See note 18, supra.

**21.** We expressly reserve the question of how we will deal with the appointment of an expert who is not "disinterested."

may not order the defendant to a state mental hospital for such an examination without the consent of the head of that state mental hospital." The amendatory language, which is essentially retained in Article 46.02, Section 3(a), reflects that the Legislature contemplated that defendants could be transferred to state mental hospitals pursuant to then Article 46.02, Section 2(f)(1) and current Article 46.02, Section 3(a). We cannot but infer that the Legislature likewise contemplated that defendants could be examined, pursuant to then Article 46.02, Section 2(f)(1) and current Article 46.02, Section 3(a), by experts employed by those state mental hospitals. Thus, the logical inference is that the Legislature did not intend that experts employed by the State would not be "disinterested," as a matter of law, within the meaning of then Article 46.02, Section 2(f)(1) and current Article 46.02, Section 3(a).

■ Finally, we note that trial judges are employed by the State of Texas. Were we to accept the appellant's contention, we would have to likewise hold that trial judges are not "disinterested" in the outcome of trials. Indeed, are the members of this Court, as employees of the State, not "disinterested?" The appellant's contention is illogical and untenable. We decline the appellant's invitation to hold that experts employed by the State are not "disinterested" as a matter of law, and hence they are not disqualified under Article 46.02, Section 3(a). Appellant's ninth contention is overruled.

The appellant's tenth contention is that the trial judge erred by allowing Dr. Hunter to testify, during the punishment stage of the trial, because his testimony was based upon statements made by the appellant to Hunter and upon a physical examination of the appellant by Hunter. The appellant contends that his Fifth Amendment privilege against self-incrimination was violated.[22]

As noted above in connection with the appellant's ninth ground of error, Dr. Hunter was appointed pursuant to Article 46.02, Section 3(a). In *Stultz v. State*, 500 S.W.2d 853 (Tex.Cr.App.1973), the trial judge appointed, pursuant to Article 46.02, Section 2(f)(1), Vernon's Ann.C.C.P.,[23] a psychologist and two psychiatrists to examine the defendant. The defendant's attorney was not present when the defendant was examined by the appointed experts. On appeal, the defendant contended that the testimony of the appointed experts violated, *inter alia,* his Fifth Amendment privilege against self-incrimination. We there quoted the following from *United States v. Williams*, 456 F.2d 217, 218–19 (5th Cir. 1972):

"Williams was not deprived of his privilege against self-incrimination when statements made by him to the psychiatrist in the absence of counsel formed part of the basis for a momentary, unfavorable characterization of Williams's personality." *Stultz v. State*, supra at 855.

■ What we said in *Stultz v. State*, supra, is equally applicable to the present case. See also *Livingston v. State*, 542 S.W.2d 655 (Tex.Cr.App.1976).

■ Furthermore, the physical examination of the appellant was not testimonial in nature. It is well established that the Fifth Amendment's privilege against self-incrimination does not extend to nontestimonial evidence. *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *Gilbert v. California*, 388 U.S. 263 (1967); *United States v. Dionisio*, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973); *Cupp v. Murphy*, 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973). Appellant's tenth contention is overruled.

The appellant's final contention is that the trial judge erred by allowing June Yeates to testify about an extraneous offense during the punishment stage of the trial.

---

**22.** The appellant does not contend that any statements made by the appellant to Dr. Hunter were admitted into evidence. See Article 46.02, Section 3(g).

**23.** Article 46.02, Section 2(f)(1), Vernon's Ann. C.C.P., was the predecessor of current Articles 46.02, Section 3(a) and 46.03, Section 3(a), Vernon's Ann.C.C.P. See footnote 18, supra.

The record reveals that the appellant failed to object to the testimony of Yeates. It is well established that the failure to timely object waives any error in the admission of evidence. *Granviel v. State*, supra; *Shumake v. State*, 502 S.W.2d 758 (Tex.Cr.App.1973). Appellant's final contention is overruled.

The judgment is affirmed.