**Loretta NEUMULLER, a/k/a Susie Neumuller, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 08–96–00050–CR.**

Court of Appeals of Texas, El Paso.

Sept. 11, 1997.

Randol L. Stout, San Angelo, for appellant.

Ori T. White, District Attorney, Ft. Stockton, for State.

Before BARAJAS, C.J., and LARSEN and CHEW, JJ.

### OPINION

LARSEN, Justice.

Loretta Neumuller, aka Susie Neumuller, appeals from her conviction for capital murder. A jury found her guilty, and the trial court assessed punishment at life imprisonment.[1] We affirm.

### Facts

Larry Albers was 79 years old at the time of his death. He was a retired rancher who owned several apartments and a flea market in Ozona, Texas. Mr. Albers had also inherited oil and bank interests from his late wife.

In April 1993, shortly following the death of his wife, Mr. Albers met Loretta Neumuller at the White Horse Lounge in Del Rio, Texas. By June, Albers had asked Neumuller to move to Ozona with him. In September, Albers deeded his home to Neumuller

---

1. The State did not seek the death penalty.

and agreed to extensive remodeling. Neumuller then moved in. Albers also promised Neumuller that he would revise his will in her favor.

Shortly after moving to Ozona, Neumuller met Tyrone "Pete" Parker, a tenant of Albers. By October, Neumuller and Parker had become lovers. In September 1993, Neumuller told Parker she was so mad at Albers that she could just kill him. Parker replied that that could be arranged. After that, Parker would occasionally mention killing Albers.

In January 1994, Albers began transferring significant amounts of property to Neumuller. He added her name to his checking account signature card. On February 28, 630 shares of common stock in the Ozona National Bank were transferred from Mary Frances West Albers (Albers' deceased wife) to Larry Albers or Loretta C. Neumuller. Also in January, Albers retained attorney Troy Williams to prepare a new will naming Neumuller his executrix and sole beneficiary. He signed the new will on January 24, 1994.

William Mason, an attorney who had represented Albers in earlier probate matters, contacted Albers in early March and asked him to come to Mason's office to discuss a debt. Albers arrived at Mason's office accompanied by Neumuller. Mason asked to speak with Albers alone. Mason testified that appellant was "miffed." In the course of their two hour meeting, Mason asked Albers why he was transferring so much of his property to Neumuller. Albers appeared astonished that he had transferred so much control and property to appellant. Mason further testified that he advised Albers on ways of regaining control of his property and that Albers agreed to do so. Mason and Albers made an appointment for the next morning.

Rather than Larry Albers, however, the next morning Neumuller came to Mason's office with a letter terminating Mason and demanding Albers' files. Mason refused to deliver them. Several days later, Mason received a letter from Troy Williams asking for Albers' files. Mason arranged to meet with Albers and Williams to make the transfer. This meeting never took place.

Instead, on March 16, 1994, Neumuller notified the sheriff's office that Albers was missing. Highway department workers spotted Albers' car down an embankment about 28 miles south of Ozona. Albers' decomposed body was in the car. The interior of the car was partially burned and officers discovered a full can of gasoline in the backseat. They also found a bloody pipe in the trunk of the car. Albers' death was ruled a homicide. The car and its contents were sent to the DPS forensic lab in Austin.

The bloody pipe bore the palm print of Tyrone "Pete" Parker. On March 30, Parker was arrested and he gave a statement to the police implicating Neumuller. She was arrested on March 31 and also gave a statement.

According to Neumuller, Parker asked her in January if Albers had made a new will and told her she should get that done. Parker told Neumuller sometime later that Albers told him (Parker) that he (Albers) had made a will leaving everything to Neumuller. In her statement, she commented, "I guess maybe he was waiting for confirmation from Larry." After the new will was made, she claimed Parker "started talking seriously about killing Larry." At some point after this, Parker told her "I think it's time to kill Larry." In response, Neumuller told Parker she could not do it. Parker told her not to worry, that he would do it. They then discussed making Albers' death look accidental. Parker said he would find someplace to make it look like an accident.

On March 15, Parker called Neumuller and told her "tonight is the time to get it over with." That evening, the two cleaned out the trunk of Albers' car. Neumuller then had dinner with Albers. After dinner, she called Parker and arranged to pick him up at a ravine near his trailer. Neumuller let Parker into the house and she joined Albers in the den where they watched the late news. Albers and Neumuller then went to their separate bedrooms. Parker followed Albers into the bathroom. Neumuller heard Albers call out. She "ran back to where Pete and Larry was at" and saw Parker on top of Albers with a pipe across his throat. At this

point, she told Parker she couldn't do this. Parker said it was too late.

Neumuller and Parker then wrapped towels around Albers' bloody head, carried him to the car, and put him in the trunk. Parker handed Neumuller the pipe which she also put in the trunk. She then drove Parker back to the ravine to get his vehicle. They drove to the spot Parker had selected, took Albers out of the trunk and in the driver's seat, put a gas can in the backseat and set paper on fire in the front seat. Parker got in beside Albers and drove the car into the bluff a few times and then ran the car over the embankment. They returned to Ozona and Neumuller cleaned the bloody bathroom.

Neumuller said she saw Parker several times after "we killed Larry." On the day before her arrest, Neumuller met Parker and complained, "I feel like a criminal." Parker apologized and said, "I never done an accident and I fucked up." Parker reassured her saying, "Won't it be funny when we send everyone in this town an invitation to our wedding."

### Venue

In her first and second points of error, appellant claims the trial court erred in denying her motion to change venue. Appellant filed a written motion and supporting affidavits in compliance with Tex.Code Crim. Proc.Ann. art. 31.03 (Vernon 1989). The State responded by filing three controverting affidavits asserting appellant could get a fair and impartial trial in Crockett County. After hearing, the trial court denied appellant's motion. Appellant re-urged the change of venue motion during voir dire. A hearing was held and again, the trial court denied the motion.

Appellant complains that the State, in its controverting affidavits, failed to attack the credibility of the defendant's affiants or their means of knowledge as required by Tex. Code Crim. Proc.Ann. art. 31.04 (Vernon 1989). She also complains that the affidavits meet the common sense guidelines recognized in *Beets v. State,* 767 S.W.2d 711, 743 (Tex.Crim.App.1987), *cert denied,* 492 U.S. 912, 109 S.Ct. 3272, 106 L.Ed.2d 579 (1989).

A defendant seeking a change of venue must file a written motion supported by affidavits of at least two credible residents of the county asserting that the defendant cannot receive a fair trial in the county due to either prejudice or a combination of influential persons against her/him. Tex.Code Crim.Proc.Ann. art. 31.03 (Vernon 1989). If the State fails to file controverting affidavits, the defendant is entitled to a change of venue as a matter of law. *Lundstrom v. State,* 742 S.W.2d 279, 281–82 (Tex.Crim.App.1986)(en banc). If the defendant participates in a hearing on the motion, puts on evidence and allows the State to do so, the issue becomes a fact question to be resolved by the trial court. *Id.* at 282. Once the issue is before the trial court, the defendant waives any complaint about the adequacy of the State's response to the motion to change venue, and is no longer entitled to a change of venue as a matter of law. *Id.*; *Robbins v. State,* 667 S.W.2d 318, 323 (Tex.App.—El Paso 1984), *rev'd on other grounds,* 717 S.W.2d 348 (Tex. Crim.App.1986). On appeal, we will not disturb the trial court's decision unless we find it abused its discretion in refusing to grant the change of venue. *DeBlanc v. State,* 799 S.W.2d 701, 705 (Tex.Crim.App.1990).

At the first venue hearing, five witnesses testified for the defense and three for the State. All witnesses agreed that in the month following the murder of Mr. Albers, there was a great deal of talk about the case. They all also agreed that the talk had died down and no one recalled having a conversation concerning the murder in the recent past.

Four of Neumuller's witnesses testified that the general consensus in the community was that the defendant was guilty and that she could not get a fair and impartial trial in Crockett County. Neumuller's final witness, however, testified that opinions were mixed and that people in Ozona were generally fair minded and would try to give her a fair and impartial trial. Three defense witnesses believed defendant was guilty, and if called to be jurors were not sure they could set aside their preconceived notions. Monica Bendele, on the other hand, thought the defendant was innocent and would be prejudiced

against the State. Les Long testified that he had no opinion on Neumuller's guilt or innocence but acknowledged that it might be difficult to get an impartial jury because so many people knew Albers and Parker.

The State's witnesses, all of whom signed controverting affidavits filed by the State, asserted that the defendant could get a fair and impartial trial in Crockett County. After hearing all of the testimony, the trial court denied the motion to change venue but noted that it would revisit the issue during voir dire of the panel and would question potential jurors about opinion and prejudice.

On September 12, 1995, prior to voir dire, defense counsel asked the court to reconsider the motion to change venue, reurging the testimony already offered and supplementing the evidence with the testimony of Linda Moore, editor of the *Ozona Stockman.* Ms. Moore testified that the weekly paper had published twelve articles about the case between March 1994 and September 1995, noting a great deal of community interest. She also testified that the Crockett County Sheriff's Office issued two press releases concerning the case, something that office had never done before. The trial court again denied the motion.

Appellant argues that the trial court abused its discretion in denying her motion to change venue because the State failed to attack the credibility or means of knowledge of the defense witnesses as required by Article 31.04. Appellant misapprehends the procedural requirements Article 31.04 places on the State.

■■■ Article 31.04 [2] dictates the pleading requirements for the State to controvert a defendant's motion to change venue. *Janecka v. State,* 937 S.W.2d 456, 467 (Tex.Crim. App.1996). If the state files affidavits challenging the credibility of the defendant's compurgators, their means of knowledge, or averring that the defendant can get a fair and impartial trial, the state has created a fact issue to be resolved by the trial court.

*See Lundstrom v. State,* 742 S.W.2d 279, 286, 287 (Tex.Crim.App.1986)(*opin. on reh'g* ). Once the issue is joined and evidence offered, the trial court must determine if such prejudice exists in the community that the likelihood of a fair and impartial trial is doubtful. *Beets,* 767 S.W.2d at 742. Absent such a showing, the discretion of the trial court to deny the motion will not be disturbed on appeal.

■■■ An applicant requesting a change of venue bears a heavy burden to prove that community prejudice is so great that it is doubtful that the defendant will be afforded a fair and impartial trial. *Beets,* 767 S.W.2d at 743. When seeking a change of venue on grounds of adverse pretrial publicity, an applicant must demonstrate actual, identifiable prejudice attributable to that publicity. *Id.* Simply because a case or offense is widely publicized does not automatically entitle a defendant to a change of venue. *Id.* The test of community prejudice does not require that jurors be entirely ignorant of the facts and issues in the case. *Id.* The trial court must determine if the publicity surrounding the case has permeated the community to such a degree that the potential jurors cannot set aside their initial opinions. *Id.* at 744.

■■■ The question of whether a change of venue should be granted is one of constitutional dimensions and in our review, we examine the testimony and exhibits offered in support of the motion to determine whether outside influences affecting community opinions are so pervasive, prejudicial, and inflammatory as to deny the defendant her due process right to a fair trial. *Id.* at 743–44; *McManus v. State,* 591 S.W.2d 505, 517 (Tex. Crim.App.1979).

After a careful review of the record, we do not find that the publicity surrounding the case created an atmosphere that was so inherently prejudicial as to preclude a fair trial. The trial court was presented with conflicting testimony as to whether appellant could obtain a fair trial in Ozona. Although

2. **Art. 31.04. Motion may be controverted**
 The credibility of the persons making affidavit for change of venue, or their means of knowledge, may be attacked by the affidavit of a credible person. The issue thus formed shall be tried by the judge, and the motion granted or refused, as the law and facts shall warrant. Tex Code Crim.Proc.Ann. art. 31.04 (Vernon 1989).

there was continuing news coverage of the case, the articles reflect objective fact-based reporting without sensationalism or speculation. Under these circumstances, we do not find that the trial court abused its discretion in denying the motion to change venue. Point of Error One is overruled.

Similarly, the trial court did not abuse its discretion in denying appellant's motion to change venue following voir dire. The venire panel was examined as a group and individually. Most venire members knew the victim or were aware of the case through media coverage or personal conversations. Of an original jury pool of 200 people, 98 remained after those with exemptions or excuses were dismissed, 57 venire members were dismissed for cause leaving 41 prospective jurors. Of these 41, appellant challenged 24 for cause. The trial court granted 4 of these challenges leaving 35 venire members. Neumuller asserts in her brief that after peremptory strikes the final jury included 6 objectionable jurors whom she had challenged for cause.

Neumuller argues that the trial court did not have discretion to deny the motion to change venue because of the necessity of calling a large number of citizens to find qualified jurors, citing *Richardson v. State*, 126 Tex.Crim. 223, 70 S.W.2d 1003 (1934) and *Pope v. State*, 126 Tex.Crim. 35, 70 S.W.2d 193 (1934). These cases stand for the proposition that the trial court has the discretion to weigh the evidence and consider the credibility of witnesses when the evidence is conflicting as to community prejudice, but, if there is no evidence controverting community prejudice, the trial court must grant a change of venue. *Richardson*, 70 S.W.2d at 1004. Because conflicting evidence as to prejudice was presented at the second hearing on the motion to change venue, once again we review the issue under an abuse of discretion standard.

Of the entire panel of 98, 65 people had read about the case in the paper, 67 had previously discussed the case, 54 knew the victim, 8 knew the defendant, 13 knew a State witness, 30 were otherwise peripherally involved in the case,[3] and 44 had a prior opinion of guilt. Of those composing the final jury panel, 11 of the 12 had read about the case, 8 had at some time discussed the case, 4 knew the victim, 1 knew the defendant, 2 were otherwise involved, and 2 had a prior opinion of guilt.

Appellant's cause challenges of two members of the final jury panel were denied by the trial court. One juror, Nedra Cosper, acknowledged on voir dire, "... I have a feeling she [Neumuller] might be guilty because she has been charged ...," but also said that the impression that the accused might be guilty would not affect her decision. The other challenged juror said that based on what people had told him, he had an idea that appellant was probably guilty but that if he were chosen as a juror, he would listen to the testimony and make up his mind accordingly.

Jurors need not be entirely ignorant of the facts of a case to be qualified. *Beets*, 767 S.W.2d at 743. The question is whether the publicity surrounding the case has permeated the community to such a degree that the potential jurors cannot set aside their initial opinions. *Id.* at 744. While true that the great majority of venire persons acknowledged some familiarity with the case, we do not require or expect jurors to be wholly ignorant of the incident or the charge against a criminal defendant. *Id.* at 745; *Adami v. State*, 524 S.W.2d 693, 704 (Tex.Crim.App. 1975). Again, the test is whether outside influences affecting the community's climate of opinion as to appellant is inherently suspect; in other words, was the climate of opinion "corrupted" so as to prevent appellant from receiving a fair and impartial trial. *Beets*, 767 S.W.2d at 745.

Although there might have been extensive knowledge in the community of either the crime, the victim, or the defendant, this alone is not sufficient to render the trial constitutionally unfair. *Id.* The record reflects that although the prospective jurors may have read or heard facts or details of the case or developed an impression as to culpability,

---

3. Potential jurors that appellant claims were otherwise involved in the case were mainly people related to, or having some family connection with, law enforcement officers or witnesses.

each stated that he or she would try the case on the evidence.

We conclude appellant has not shown that outside influences corrupted the community's climate of opinion, nor that under the totality of circumstances she suffered a constitutional violation with respect to the pretrial publicity. The trial judge was within the limits of his discretion in denying the change of venue. Appellant's second point of error is overruled.

### Evidence of Remuneration

■ In her third point of error, appellant argues that there was no evidence that she entered into an employment agreement or promised to pay or share benefits with Tyrone Parker if he would kill Larry Albers.

Under this point of error, appellant also complains that the trial court erred in allowing the State to amend the indictment. Appellant filed a motion to quash the indictment on the grounds that it failed to state all the elements of the offense charged. The trial court, pursuant to TEX.CODE CRIM.PROC.ANN. art. 28.10, allowed the State to amend. Appellant relies on *Bowie v. State*, 401 S.W.2d 829, 831 (Tex.Crim.App.1966) interpreting former Article 28.10 as limiting amendment to "matters of form." The statute was amended in 1985 to read "a matter of form or substance in an indictment ... may be amended...." TEX.CODE CRIM.PROC.ANN. art. 28.10(a)(Vernon 1989). The revised statute also allows the defense ten days to respond to the amended indictment. TEX.CODE CRIM.PROC.ANN. art. 28.10(a)(Vernon 1989). At the time leave to amend was granted, the State and defense apparently agreed to delay proceedings. Thus, it was not error to allow amendment.

The amended indictment read:

... Loretta C. Neumuller did then and there intentionally and knowingly cause the death of an individual, namely, Lawrence E. Albers, by employing TYRONE C. PARKER for remuneration, or the promise of remuneration, to-wit: to share in the anticipated financial benefits resulting from the death of Lawrence E. Albers or to share in anticipated financial gain under the laws of probate resulting from

the death of Lawrence E. Albers, to murder the said Lawrence E. Albers and pursuant to said agreement, the said Tyrone C. Parker, did ... then and there intentionally and knowingly cause the death of the said Lawrence E. Albers by striking him in the head with a pipe.

Thus, this is a case of "murder for hire" pursuant to TEX. PENAL CODE ANN. § 19.03(a)(3)(Vernon 1994). The State was required to prove that Neumuller employed Parker to murder Albers in exchange for her promise to share in the anticipated benefits flowing from Albers' death. Appellant argues that there is no evidence of an employment agreement nor any evidence of her explicit promise to pay or share benefits in return for killing Albers.

■ In passing on legal sufficiency of the evidence, we determine whether any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318, 319, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560, 573 (1979); *Geesa v. State*, 820 S.W.2d 154, 159 (Tex.Crim.App.1991). We do not resolve conflicts of fact or assign credibility to witnesses, as it was the function of the trier of fact to accept or reject any, part, or all of any witness's testimony. *See Adelman v. State*, 828 S.W.2d 418, 421 (Tex.Crim.App.1992)(en banc); *Matson v. State*, 819 S.W.2d 839, 843 (Tex.Crim.App.1991). Our duty, rather, is to determine only if the explicit and implicit findings of the trier of fact are rational by viewing all the evidence in a light most favorable to the verdict. *Adelman*, 828 S.W.2d at 421–22. In so doing, we resolve any inconsistencies in the evidence in favor of the verdict. *Matson*, 819 S.W.2d at 843, *quoting Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim.App.1988).

■ In a murder for hire charge, the focus is on the accused's state of mind. *See McManus v. State*, 591 S.W.2d 505, 513 (Tex. Crim.App.1979). Both an agreement and a promise to pay may be inferred from the parties' conduct. *See id.* We find there is ample evidence from which a rational juror could infer the existence of an agreement and promise to pay.

Parker was aware of Neumuller's financial relationship with Albers. He encouraged her to induce Albers to change his will. Neumuller admitted in her written statement that she and Parker discussed how to make the killing look like an accident. She repeatedly said that she could not, herself, kill Albers and was reassured by Parker that he would do it. She relied on Parker to plan the killing and then assisted him in carrying it out. This is evidence from which a rational juror could find that Neumuller and Parker agreed to kill Albers and that she relied on Parker to do the actual killing.

While we agree there is no evidence that Neumuller explicitly promised to share the benefits she would gain by Albers' death, such a promise may be inferred. Parker and appellant had an intimate relationship and there was evidence they intended to marry. Parker kept himself well informed about Neumuller's financial relationship with Albers. He sought confirmation that Albers had in fact changed his will in her favor. Parker decided it was time for them to kill Albers only days after Albers met with his former attorney and may have been contemplating changing his will. This is evidence from which a jury could find that Neumuller led Parker to expect he would share in her good fortune upon Albers' death. Point of Error Three is overruled.

### Jury Charge

■ In her fourth point of error, Neumuller contends that the trial court erred in refusing to include her requested definition of remuneration in the jury charge, which was:

[R]emuneration as used in this charge is meant payment by one person to another in compensation for specific services or services rendered pursuant to an agreement therefore.

Appellant argues that the court's failure to include the definition of "remuneration" had a detrimental effect on the jury's ability to understand the charge. Appellant claims that because the jury asked for several clari-

fications from the trial court during deliberations, it was unable to understand the charge. First, the jury inquired if the law of parties applied to capital murder as well as murder.[4] The jurors then requested a definition of "employing" in the sentence "by employing Tyrone C. Parker...." It is unclear to us how this relates to the failure of the trial court to include a definition of remuneration in the charge.

■ Words, phrases, and terms used in the Penal Code or Code of Criminal Procedure are to be taken and understood in their ordinary meaning in common language, except where specially defined. Courts should not be involved in the business of redefining words used in an ordinary sense by the Texas Legislature. Tex.Code Crim.Proc. Ann. art. 3.01 (Vernon 1977). *See also* Tex.Penal Code Ann. § 1.05(b)(Vernon 1994); Tex.Gov't Code Ann. § 311.011 (Vernon 1988). When read in context, such words should be open to the broadest possible understanding to which they are reasonably susceptible. *Bingham v. State,* 915 S.W.2d 9, 10 (Tex.Crim.App.1994); *Vernon v. State,* 841 S.W.2d 407, 409–10 (Tex.Crim.App. 1992). Jurors are supposed to know such common meanings and terms, and under such circumstances, it is not necessary for words to be defined in the charge. *Penry v. State,* 903 S.W.2d 715, 747 (Tex.Crim.App. 1995). Moreover, remuneration was defined in the indictment as: "To share in the anticipated financial benefits resulting from the death of LAWRENCE E. ALBERS or to share in anticipated financial gain under laws of probate resulting from the death of LAWRENCE E. ALBERS...." It was not error for the trial court to refuse to include the requested definition in the jury charge. Appellant's fourth point of error is overruled.

### Suppression of Evidence and Statements

In her fifth point of error, appellant argues that the trial court erred in admitting into evidence her written and videotaped statements, as well as evidence seized during a

---

4. The jury was instructed on the lesser-included offense of murder and the law of parties in connection with murder.

search of her house. She contends these statements and evidence were taken in violation of the Texas Code of Criminal Procedure as well as her rights under the Fifth and Sixth Amendments of the United States Constitution.

On a motion to suppress, the trial judge is the exclusive judge of witness credibility, and the judge may believe or disbelieve any, part, or all of any witness's testimony. *Cantu v. State,* 817 S.W.2d 74, 77 (Tex.Crim.App. 1991); *see also Romero v. State,* 800 S.W.2d 539, 544 (Tex.Crim.App.1990); *State v. Wood,* 828 S.W.2d 471, 474 (Tex.App.—El Paso 1992, no pet.). On appeal, a reviewing court does not engage in its own factual review but decides only whether the trial court's fact findings are supported by the record. *Lucas v. State,* 791 S.W.2d 35, 47 (Tex.Crim.App. 1989). We address only the question of whether the trial court properly applied the law to the facts. *Romero,* 800 S.W.2d at 543.

■ Neumuller's initial complaint under this point of error is that her statement should be suppressed because the delay between her arrest and being brought before a magistrate was a violation of Tex.Code Crim. Proc.Ann. art. 15.17 (Vernon Supp.1997).

On March 31, 1994, Neumuller was arrested and charged with capital murder. She was transported to the Crockett County Sheriff's Office where she was provided with a written set of constitutional warnings. These warnings were read to her and she was given the opportunity to initial each warning, indicating she understood each right. She signed the *Miranda* warning acknowledging that she waived those rights and voluntarily gave a statement to Investigator Larry Jackson. The following afternoon she was arraigned before Magistrate James Hearne.

■ That Neumuller was not taken before a magistrate prior to making a statement does not vitiate a confession otherwise properly obtained. *Maloy v. State,* 582 S.W.2d 125, 128 (Tex.Crim.App.1979). Even an unreasonable delay in bringing an accused before a magistrate, of which we have no evidence here, will only render a confession inadmissible upon a showing of some causal connection between the delay and the making of the confession. *Maloy,* 582 S.W.2d at 128; *Von Byrd v. State,* 569 S.W.2d 883, 894 (Tex. Crim.App.1978), *cert. denied,* 441 U.S. 967, 99 S.Ct. 2418, 60 L.Ed.2d 1073, *reh'g denied,* 444 U.S. 888, 100 S.Ct. 190, 62 L.Ed.2d 123 (1979); *Myre v. State,* 545 S.W.2d 820, 824–25 (Tex.Crim.App.1977). The trial judge's findings of fact and conclusions of law, which are supported by the record, reflect that defendant was warned in compliance with Tex.Code Crim.Proc.Ann. art. 38.22, and that the confession was voluntarily given. The violation of Article 15.17, if any, did not invalidate the confession. *Von Byrd,* 569 S.W.2d at 894; *Shadrick v. State,* 491 S.W.2d 681, 684 (Tex.Crim.App.1973).

■ Appellant next claims that the trial court erred in admitting her written statement in violation of her Fifth and Sixth Amendment right to counsel.

Neumuller claims that at the time her March 31 statement was taken, sheriff's officers were aware that she was represented by attorney Troy Williams. Investigator Larry Jackson and Texas Ranger Johnny Allen first interviewed Neumuller at her home on March 25 in the presence of her sister and attorney Troy Williams. Williams was advising Neumuller on the probate of Albers' will. After questioning at her home, the officers asked Neumuller to come to the sheriff's office to make a written statement. This request was made in Williams' presence; nevertheless, he did not accompany her to the sheriff's office. Rather, her sister accompanied her to the sheriff's office and witnessed her statement. At the time Neumuller made this statement, she was not under arrest nor had she been read her *Miranda* rights. The statement she gave the officers was an exculpatory explanation of Albers' disappearance. After taking this statement, the officers fingerprinted Neumuller and returned her to her residence.

On March 31, Neumuller was arrested and taken to the Crockett County Jail, advised of her rights, and informed that she was being charged with capital murder. She then gave a statement that was later reduced to writing.

 The Fifth Amendment entitles a defendant to the assistance of counsel if invoked. *See Holloway v. State*, 780 S.W.2d 787, 793 (Tex.Crim.App.1989). Once an accused asserts her Fifth Amendment right to counsel, all interrogation must cease, and may begin again only if counsel has been made available, or if the accused herself initiates further communication. *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378, 386 (1981); *Holloway*, 780 S.W.2d at 789; *State v. Garibay*, 838 S.W.2d 268, 270 (Tex.App.—El Paso 1992, no pet.). Neumuller was read her rights, stated that she understood them, including her right to an attorney, but nonetheless waived those rights and spoke with the officers.

 The Sixth Amendment right to the assistance of counsel is not invoked until formal adversary judicial proceedings have been initiated. The arrest and questioning of a person do not constitute sufficient formalization of proceedings to trigger the Sixth Amendment requirement of counsel. *Nichols v. State*, 754 S.W.2d 185, 190 (Tex.Crim. App.1988); *Garibay*, 838 S.W.2d at 271. There is no evidence that Neumuller, although repeatedly warned, ever invoked her Fifth Amendment right to silence or requested an attorney. The trial court did not err in admitting the statement.

 Neumuller next argues that the videotaped statement of April 1, 1994 was taken in violation of her Sixth Amendment right to counsel.

Neumuller was arraigned before Magistrate Hearne at 1:50 p.m. During the pretrial hearing on the motion to suppress her videotaped statement, Magistrate Hearne did not recall if she had specifically requested that he appoint counsel, but noted that he most likely said something to the effect that "if you want an attorney, I will appoint one for you. . . ." He testified that he gave Neumuller the statutory warnings, she was returned to detention, and he received an application for appointment of counsel from appellant at some later time. The record does not reflect when she made this request. Shortly after her arraignment, Neumuller was again interrogated by Officers Jackson and Davis. Prior to conducting the video interrogation, she was again read *Miranda* warnings and signed a waiver of her rights. This was reflected on the videotape.

 The Sixth Amendment guarantees more than an entitlement to counsel upon invocation. *Holloway*, 780 S.W.2d at 793. Designed to remedy any imbalance in our adversary system, the Sixth Amendment promises that an accused is entitled to defense counsel in all criminal prosecutions. *Id.* When an accused's Sixth Amendment right to counsel attaches to an offense for which adversarial proceedings have begun, she is entitled to the assistance of counsel at each "critical" stage of the prosecution, absent a valid waiver. *Upton v. State*, 853 S.W.2d 548, 553 (Tex.Crim.App.1993). If an accused is interrogated after the right to counsel has attached, and a statement obtained, the police may not use that statement against the accused unless counsel was present or right to counsel waived when the statement was obtained. *Brewer v. Williams*, 430 U.S. 387, 399–404, 97 S.Ct. 1232, 1239–42, 51 L.Ed.2d 424, 436–40 (1977); *Terrell v. State*, 891 S.W.2d 307, 312 (Tex. App.—El Paso 1994, pet. ref'd).

 The burden is on the State to prove such a waiver was made voluntarily, knowingly, and intelligently. *Upton*, 853 S.W.2d at 553. Waiver is shown as a matter of law with regard to pretrial questioning if an accused (1) who has not yet retained or been appointed counsel; (2) decides voluntarily not to rely on her right to counsel; and (3) the decision is made with the understanding that she could remain silent and request a lawyer and that the State could use any statement she gave against her. *Robinson v. State*, 851 S.W.2d 216, 224 (Tex.Crim.App. 1991), *citing Patterson v. Illinois*, 487 U.S. 285, 297, 108 S.Ct. 2389, 2397, 101 L.Ed.2d 261, 275 (1988); *Terrell*, 891 S.W.2d at 312. A *Miranda* waiver may be sufficient to show the voluntary relinquishment required for waiver of the Sixth Amendment right to counsel. *Patterson*, 487 U.S. at 292–93, 108 S.Ct. at 2395, 101 L.Ed.2d at 272–73; *Terrell*, 891 S.W.2d at 312.

■ The Sixth Amendment right to the assistance of counsel does not attach prior to the initiation of adversary judicial proceedings whether by way of formal charge, preliminary hearing, indictment, information, or arraignment. *Green v. State,* 872 S.W.2d 717, 719 (Tex.Crim.App.1994); *Terrell,* 891 S.W.2d at 312; *Garibay,* 838 S.W.2d at 271. An arraignment signals the initiation of adversarial proceedings. *Nehman v. State,* 721 S.W.2d 319, 321 (Tex.Crim. App.1986)(en banc), *quoting Michigan v. Jackson,* 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986). Here, there is no question that adversarial proceedings had begun before appellant's videotaped statement was taken. She was arraigned at 1:50 p.m. on April 1 and the videotaped interview commenced around 2:15 p.m. There is, however, a factual dispute as to when or if Neumuller requested a court-appointed attorney. If a defendant, at an arraignment, requests counsel, any waiver of the defendant's right to counsel for police-initiated interrogation is invalid. *Nehman,* 721 S.W.2d at 321–22. The protections of the Sixth Amendment do not attach, however, until two things occur: (1) adversarial proceedings are initiated; and (2) the defendant has availed herself of the right to counsel. See *Nehman,* 721 S.W.2d at 321.

Although Neumuller presented some evidence from which it might be inferred that she requested counsel at her arraignment or at some point on April 1, the record does not indicate when or even if she made the request. There is nothing in the record to indicate that she explicitly requested counsel. On the contrary, Neumuller signed a waiver prior to the interrogation. During the interview, she was fully advised of her rights and agreed she wanted to make the statement. Under these circumstances, we find the trial court is in the best position to evaluate the testimony, and we will defer to the trial court's findings. *Davis v. State,* 829 S.W.2d 218, 220 (Tex.Crim.App.1992). Because we defer to the trial court's implicit finding that defendant failed to request an attorney at her arraignment and that she voluntarily, knowingly, and intelligently waived her Sixth Amendment right to counsel, we find the trial court did not err in admitting a portion of the videotaped interview.

Pursuant to the above discussion of each of Neumuller's arguments in support of her fifth point of error, we overrule the point.

■ Finally, in Point of Error Six, Neumuller asserts that the trial court erred in admitting evidence obtained in an illegal search of the residence she had shared with Albers. She argues that her consent allowed only the two subscribing witnesses to search the residence and that her oral consent was not voluntarily given.

■ It is well settled that when the State relies on a consent to search, as it does here, the burden of proof is on the prosecution to show by clear and convincing evidence that the consent was freely and voluntarily given. *Allridge v. State,* 850 S.W.2d 471, 493 (Tex.Crim.App.1991); *Johnson v. State,* 803 S.W.2d 272, 286–87 (Tex.Crim.App.1990), *cert. denied,* 501 U.S. 1259, 111 S.Ct. 2914, 115 L.Ed.2d 1078 (1991); *see also Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Chavarria v. State,* 876 S.W.2d 388, 392 (Tex.App.—El Paso 1994, no pet.). The question of whether a consent to search was "voluntary" is a question of fact to be determined from the totality of the circumstances. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Heitman v. State,* 815 S.W.2d 681 (Tex.Crim.App.1991); *Juarez v. State,* 758 S.W.2d 772, 775 (Tex.Crim.App. 1988). The prosecution must show the consent given was positive and unequivocal, and there must not be duress or coercion, actual or implied. *Paulus v. State,* 633 S.W.2d 827, 850 (Tex.Crim.App.1981); *Chavarria,* 876 S.W.2d at 392. The burden is not discharged if the prosecution does no more than show an acquiescence to a claim of lawful authority. *Id.* Consent must be voluntary and neither physically or psychologically coerced. *Juarez,* 758 S.W.2d at 772, 775. However, simply because a person is under arrest does not inherently preclude free and voluntary consent. *Id.; Chavarria,* 876 S.W.2d at 392.

The trial court's findings will not be disturbed absent a clear abuse of discretion. *Dancy v. State,* 728 S.W.2d 772, 777 (Tex.

Crim.App.), *cert. denied,* 484 U.S. 975, 108 S.Ct. 485, 98 L.Ed.2d 484 (1987). If the findings of fact are supported by the record, this court is not at liberty to disturb them and, on review, we address only the question of whether the trial court improperly applied the law to the facts. *Romero,* 800 S.W.2d at 543; *Self v. State,* 709 S.W.2d 662, 664–65 (Tex.Crim.App.1986); *Johnson v. State,* 698 S.W.2d 154, 159 (Tex.Crim.App.1985), *cert. denied,* 479 U.S. 871, 107 S.Ct. 239, 93 L.Ed.2d 164 (1986).

On March 31, District Judge Jones issued an evidentiary search warrant for Neumuller's residence and an arrest warrant for her person. Several sheriff's deputies, other law enforcement officers, and a DPS forensic lab team accompanied Sheriff Wilson to Neumuller's residence on March 31. The search warrant was never executed, however, as Neumuller signed a consent to search. Neumuller was arrested and taken to the Crockett County Jail. As the arresting officers were leaving with Neumuller, she asked "what are all of those people doing here?" Allen explained that the consent form gave them permission to conduct the search of her residence, to which she replied, "Oh, Okay."

In arguing that her oral consent was involuntary, Neumuller presented nothing more than that appellant was under arrest at the time she gave the consent, and that there were a number of law enforcement officers outside her home. This does not contradict the State's case that the search was performed pursuant to a valid consent to search.

We find that the trial court did not abuse its discretion in denying the motion to suppress evidence, given Neumuller's failure to produce any evidence that her consent was coerced or otherwise involuntary. Thus, we find sufficient evidence in the record to support the trial court's decision. Accordingly, appellant's Point of Error Six is overruled.

### CONCLUSION

Having overruled each of Neumuller's points of error, we affirm the conviction.